WIEMAN ET AL. *v.* UPDEGRAFF ET AL.

No. 14. Argued October 16, 1952.—Decided December 15, 1952.

*H. D. Emery* argued the cause for appellants. With him on the brief was *Robert J. Emery*.

*Fred Hansen,* First Assistant Attorney General of Oklahoma, argued the cause for the Board of Regents of the Oklahoma Agricultural Colleges et al., appellees. With him on the brief was *Mac Q. Williamson,* Attorney General.

*Paul W. Updegraff* argued the cause and filed a brief *pro se.*

*Osmond K. Fraenkel* filed a brief for the American Civil Liberties Union, as *amicus curiae,* urging reversal.

MR. JUSTICE CLARK delivered the opinion of the Court.

This is an appeal from a decision of the Supreme Court of Oklahoma upholding the validity of a loyalty oath [1] prescribed by Oklahoma statute for all state officers and

---

[1] "I, _____, do solemnly swear (or affirm) that I will support and defend the Constitution of the United States and the Constitution of the State of Oklahoma against all enemies, foreign and domestic; that I will bear true faith and allegiance to the Constitution of the United States and the Constitution of the State of Oklahoma; that I take this obligation freely, without any mental reservation or purpose of evasion; and that I will well and faithfully discharge the duties upon which I am about to enter.

"And I do further swear (or affirm) that I do not advocate, nor am I a member of any party or organization, political or otherwise, that now advocates the overthrow of the Government of the United States or of the State of Oklahoma by force or violence or other unlawful means; That I am not affiliated directly or indirectly with the Communist Party, the Third Communist International, with any foreign political agency, party, organization or Government, or with any agency, party, organization, association, or group whatever which has been officially determined by the United States Attorney General or other authorized agency of the United States to be a communist front or subversive organization; nor do I advocate revolution, teach or justify a program of sabotage, force or violence, sedition or treason, against the Government of the United States or of this State; nor do I advocate directly or indirectly, teach or justify by any means whatsoever, the overthrow of the Government of the United States or of this State, or change in the form of Government thereof, by force

employees. Okla. Stat. Ann., 1950, Tit. 51, §§ 37.1–37.8 (1952 Supp.). Appellants, employed by the State as members of the faculty and staff of Oklahoma Agricultural and Mechanical College, failed, within the thirty days permitted, to take the oath required by the Act. Appellee Updegraff, as a citizen and taxpayer, thereupon brought this suit in the District Court of Oklahoma County to enjoin the necessary state officials from paying further compensation to employees who had not subscribed to the oath. The appellants, who were permitted to intervene, attacked the validity of the Act on the grounds, among others, that it was a bill of attainder; an *ex post facto* law; impaired the obligation of their contracts with the State and violated the Due Process Clause of the Fourteenth Amendment. They also sought a mandatory injunction directing the state officers to pay

---

or any unlawful means; that I will take up arms in the defense of the United States in time of War, or National Emergency, if necessary; that within the five (5) years immediately preceding the taking of this oath (or affirmation) I have not been a member of the Communist Party, the Third Communist International, or of any agency, party, organization, association, or group whatever which has been officially determined by the United States Attorney General or other authorized public agency of the United States to be a communist front or subversive organization, or of any party or organization, political or otherwise, that advocated the overthrow of the Government of the United States or of the State of Oklahoma by force or violence or other unlawful means;

"And I do further swear (or affirm) that during such time as I am

*(Here put name of office, or, if an employee,) insert 'An employee*

*of' followed by the complete designation of the employing officer,*

*office, agency, authority, commission, department or institution.*

"I will not advocate and that I will not become a member of any party or organization, political or otherwise, that advocates the overthrow of the Government of the United States or of the State of Oklahoma by force or violence or other unlawful means."

their salaries regardless of their failure to take the oath. Their objections centered largely on the following clauses of the oath:

> ". . . That I am not affiliated directly or indirectly . . . with any foreign political agency, party, organization or Government, or with any agency, party, organization, association, or group whatever which has been officially determined by the United States Attorney General or other authorized agency of the United States to be a communist front or subversive organization; . . . that I will take up arms in the defense of the United States in time of War, or National Emergency, if necessary; that within the five (5) years immediately preceding the taking of this oath (or affirmation) I have not been a member of . . . any agency, party, organization, association, or group whatever which has been officially determined by the United States Attorney General or other authorized public agency of the United States to be a communist front or subversive organization . . . ."

The court upheld the Act and enjoined the state officers from making further salary payments to appellants. The Supreme Court of Oklahoma affirmed, *sub nom. Board of Regents* v. *Updegraff,* 205 Okla. 301, 237 P. 2d 131 (1951).[2] We noted probable jurisdiction because of the public importance of this type of legislation and the recurring serious constitutional questions which it presents.

---

[2] The state officials named as defendants in Updegraff's suit took the position in the state courts that the statute was unconstitutional. Following a policy of the Oklahoma Attorney General not to appeal from adverse decisions of the state supreme court, these defendants are here only because they were made appellees by the appellant-intervenors. They have chosen in their brief merely to restate, without argument, their position in the court below.

The District Court of Oklahoma County in holding the Act valid concluded that the appellants were compelled to take the oath as written; that the appellants "and each of them, did not take and subscribe to the oath as provided in section 2 of the Act and wilfully refused to take that oath and by reason thereof the Board of Regents is enjoined from paying them, and their employment is terminated." In affirming, the Supreme Court of Oklahoma held that the phrase of the oath "any foreign political agency, party, organization or Government, or with any agency, party, organization, association, or group whatever which has been officially determined by the United States Attorney General or other authorized agency of the United States to be a communist front or subversive organization" actually "refers to a list or lists of such organizations in existence at the time of the passage of the act which had been prepared by the Attorney General [of the United States] under governmental directive. Such list or lists are in effect made a part of the oath by reference." On this point the opinion continues: "There is no requirement in the act that an oath be taken of nonmembership in organizations not on the list of the Attorney General of the United States at the time of the passage of this act."

We read this part of the highest state court's decision as limiting the organizations proscribed by the Act to those designated on the list or lists of the Attorney General which had been issued prior to the effective date of the Act. Although this interpretation discarded clear language of the oath as surplusage, the court denied the appellants' petition for rehearing which included a plea that refusal of the court to permit appellants to take the oath as so interpreted was violative of due process.

The purpose of the Act, we are told, "was to make loyalty a qualification to hold public office or be employed by the State." 205 Okla., at 305, 237 P. 2d, at 136.

During periods of international stress, the extent of legislation with such objectives accentuates our traditional concern about the relation of government to the individual in a free society. The perennial problem of defining that relationship becomes acute when disloyalty is screened by ideological patterns and techniques of disguise that make it difficult to identify. Democratic government is not powerless to meet this threat, but it must do so without infringing the freedoms that are the ultimate values of all democratic living. In the adoption of such means as it believes effective, the legislature is therefore confronted with the problem of balancing its interest in national security with the often conflicting constitutional rights of the individual.

In a series of cases coming here in recent years, we have had occasion to consider legislation aimed at safeguarding the public service from disloyalty. *Garner* v. *Board of Public Works*, 341 U. S. 716 (1951); *Adler* v. *Board of Education*, 342 U. S. 485 (1952); *Gerende* v. *Board of Supervisors*, 341 U. S. 56 (1951). It is in the context of these decisions that we determine the validity of the oath before us.

*Garner* involved a Los Angeles ordinance requiring all city employees to swear that they did not advocate the overthrow of the government by unlawful means or belong to organizations with such objectives. The ordinance implemented an earlier charter amendment which disqualified from municipal employment all persons unable to take such an oath truthfully. One of the attacks made on the oath in that case was that it violated due process because its negation was not limited to organizations known by the employee to be within the proscribed class. This argument was rejected because we felt justified in assuming that *scienter* was implicit in each clause of the oath.

*Adler* also indicated the importance of determining whether a rule of exclusion based on association applies to innocent as well as knowing activity. New York had sought to bar from employment in the public schools persons who advocate, or belong to organizations which advocate, the overthrow of the government by unlawful means. The Feinberg Law directed the New York Board of Regents to make a listing, after notice and hearing, of organizations of the type described. Under § 3022 of the statute, the Regents provided by regulation that membership in a listed organization should be *prima facie* evidence of disqualification for office in the New York public schools. In upholding this legislation, we expressly noted that the New York courts had construed the statute to require knowledge of organizational purpose before the regulation could apply. 342 U. S., at 494. Cf. *American Communications Assn.* v. *Douds,* 339 U. S. 382, 413 (1950).

The oath in *Gerende* was required of candidates for public office who sought places on a Maryland ballot. On oral argument in that case, the Maryland Attorney General assured us that he would advise the proper state authorities to accept, as complying with the statute, an affidavit stating that the affiant was not engaged in an attempt to overthrow the government by force or violence or knowingly a member of an organization engaged in such an attempt. Because we read an earlier Maryland Court of Appeals' decision as interpreting the statute so that such an affidavit would satisfy its requirements, we affirmed on the basis of this assurance.

We assumed in *Garner,* that if our interpretation of the oath as containing an implicit *scienter* requirement was correct, Los Angeles would give the petitioners who had refused to sign the oath an opportunity to take it as interpreted and resume their employment. But here, with our decision in *Garner* before it, the Oklahoma Su-

preme Court refused to extend to appellants an opportunity to take the oath. In addition, a petition for rehearing which urged that failure to permit appellants to take the oath as interpreted deprived them of due process was denied. This must be viewed as a holding that knowledge is not a factor under the Oklahoma statute. We are thus brought to the question touched on in *Garner, Adler,* and *Gerende:* whether the Due Process Clause permits a state, in attempting to bar disloyal individuals from its employ, to exclude persons solely on the basis of organizational membership, regardless of their knowledge concerning the organizations to which they had belonged. For, under the statute before us, the fact of membership alone disqualifies. If the rule be expressed as a presumption of disloyalty, it is a conclusive one.

But membership may be innocent. A state servant may have joined a proscribed organization unaware of its activities and purposes. In recent years, many completely loyal persons have severed organizational ties after learning for the first time of the character of groups to which they had belonged. "They had joined, [but] did not know what it was, they were good, fine young men and women, loyal Americans, but they had been trapped into it—because one of the great weaknesses of all Americans, whether adult or youth, is to join something." [3] At the time of affiliation, a group itself may be innocent, only later coming under the influence of those who would turn it toward illegitimate ends. Conversely, an organization formerly subversive and therefore designated as such may have subsequently freed itself from the influences which originally led to its listing.

There can be no dispute about the consequences visited upon a person excluded from public employment on dis-

---

[3] Testimony of J. Edgar Hoover, Hearings before House Committee on Un-American Activities on H. R. 1884 and H. R. 2122, 80th Cong., 1st Sess. 46.

loyalty grounds. In the view of the community, the stain is a deep one; indeed, it has become a badge of infamy. Especially is this so in time of cold war and hot emotions when "each man begins to eye his neighbor as a possible enemy." [4] Yet under the Oklahoma Act, the fact of association alone determines disloyalty and disqualification; it matters not whether association existed innocently or knowingly. To thus inhibit individual freedom of movement is to stifle the flow of democratic expression and controversy at one of its chief sources. We hold that the distinction observed between the case at bar and *Garner, Adler* and *Gerende* is decisive. Indiscriminate classification of innocent with knowing activity must fall as an assertion of arbitrary power. The oath offends due process.

But appellee insists that *Adler* and *United Public Workers* v. *Mitchell,* 330 U. S. 75 (1947), are contra. We are referred to our statement in *Adler* that persons seeking employment in the New York public schools have "no right to work for the State in the school system on their own terms. *United Public Workers* v. *Mitchell* . . . . They may work for the school system upon the reasonable terms laid down by the proper authorities of New York." 342 U. S., at 492. To draw from this language the facile generalization that there is no constitutionally protected right to public employment is to obscure the issue. For, in *United Public Workers,* though we held that the Federal Government through the Hatch Act could properly bar its employees from certain types of political activity thought inimical to the interests of the Civil Service, we cast this holding into perspective by emphasizing that Congress could not "enact a regulation providing that no Republican, Jew or Negro shall be appointed to federal

---

[4] Address by Judge Learned Hand at the 86th Convocation of the University of the State of New York, delivered October 24, 1952, at Albany, New York.

office, or that no federal employee shall attend Mass or take any active part in missionary work." 330 U. S., at 100. See also *In re Summers,* 325 U. S. 561, 571 (1945). We need not pause to consider whether an abstract right to public employment exists. It is sufficient to say that constitutional protection does extend to the public servant whose exclusion pursuant to a statute is patently arbitrary or discriminatory.

Because of this disposition, we do not pass on the serious questions raised as to whether the Act, in proscribing those "communist front or subversive organizations" designated as such on lists of the Attorney General of the United States, gave fair notice to those affected, in view of the fact that those listings have never included a designation of "communist fronts," and have in some cases designated organizations without classifying them. Nor need we consider the significance of the differing standards employed in the preparation of those lists and their limited evidentiary use under the Federal Loyalty Program.

*Reversed.*

MR. JUSTICE JACKSON, not having heard the argument, took no part in the consideration or decision of this case.

MR. JUSTICE BURTON concurs in the result.

MR. JUSTICE BLACK, concurring.

I concur in all the Court says in condemnation of Oklahoma's test oath. I agree that the State Act prescribing that test oath is fatally offensive to the due process guarantee of the United States Constitution.

History indicates that individual liberty is intermittently subjected to extraordinary perils. Even countries dedicated to government by the people are not free from such cyclical dangers. The first years of our Republic marked such a period. Enforcement of the Alien and

Sedition Laws by zealous patriots who feared ideas made it highly dangerous for people to think, speak, or write critically about government, its agents, or its policies, either foreign or domestic. Our constitutional liberties survived the ordeal of this regrettable period because there were influential men and powerful organized groups bold enough to champion the undiluted right of individuals to publish and argue for their beliefs however unorthodox or loathsome. Today however, few individuals and organizations of power and influence argue that unpopular advocacy has this same wholly unqualified immunity from governmental interference. For this and other reasons the present period of fear seems more ominously dangerous to speech and press than was that of the Alien and Sedition Laws. Suppressive laws and practices are the fashion. The Oklahoma oath statute is but one manifestation of a national network of laws aimed at coercing and controlling the minds of men. Test oaths are notorious tools of tyranny. When used to shackle the mind they are, or at least they should be, unspeakably odious to a free people. Test oaths are made still more dangerous when combined with bills of attainder which like this Oklahoma statute impose pains and penalties for past lawful associations and utterances.

Governments need and have ample power to punish treasonable acts. But it does not follow that they must have a further power to punish thought and speech as distinguished from acts. Our own free society should never forget that laws which stigmatize and penalize thought and speech of the unorthodox have a way of reaching, ensnaring and silencing many more people than at first intended. We must have freedom of speech for all or we will in the long run have it for none but the cringing and the craven. And I cannot too often repeat my belief that the right to speak on matters of public concern must be wholly free or eventually be wholly lost.

It seems self-evident that all speech criticizing government rulers and challenging current beliefs may be dangerous to the status quo. With full knowledge of this danger the Framers rested our First Amendment on the premise that the slightest suppression of thought, speech, press, or public assembly is still more dangerous. This means that individuals are guaranteed an undiluted and unequivocal right to express themselves on questions of current public interest. It means that Americans discuss such questions as of right and not on sufferance of legislatures, courts or any other governmental agencies. It means that courts are without power to appraise and penalize utterances upon their notion that these utterances are dangerous. In my view this uncompromising interpretation of the Bill of Rights is the one that must prevail if its freedoms are to be saved. Tyrannical totalitarian governments cannot safely allow their people to speak with complete freedom. I believe with the Framers that our free Government can.

MR. JUSTICE DOUGLAS concurs in this opinion.

MR. JUSTICE FRANKFURTER, whom MR. JUSTICE DOUGLAS joins, concurring.

The times being what they are, it is appropriate to add a word by way of emphasis to the Court's opinion, which I join.

The case concerns the power of a State to exact from teachers in one of its colleges an oath that they are not, and for the five years immediately preceding the taking of the oath have not been, members of any organization listed by the Attorney General of the United States, prior to the passage of the statute, as "subversive" or "Communist-front." Since the affiliation which must thus be forsworn may well have been for reasons or for purposes as innocent as membership in a club of

one of the established political parties, to require such an oath, on pain of a teacher's loss of his position in case of refusal to take the oath, penalizes a teacher for exercising a right of association peculiarly characteristic of our people. See Arthur M. Schlesinger, Sr., Biography of a Nation of Joiners, 50 Am. Hist. Rev. 1 (1944), reprinted in Schlesinger, Paths To The Present, 23. Such joining is an exercise of the rights of free speech and free inquiry. By limiting the power of the States to interfere with freedom of speech and freedom of inquiry and freedom of association, the Fourteenth Amendment protects all persons, no matter what their calling. But, in view of the nature of the teacher's relation to the effective exercise of the rights which are safeguarded by the Bill of Rights and by the Fourteenth Amendment, inhibition of freedom of thought, and of action upon thought, in the case of teachers brings the safeguards of those amendments vividly into operation. Such unwarranted inhibition upon the free spirit of teachers affects not only those who, like the appellants, are immediately before the Court. It has an unmistakable tendency to chill that free play of the spirit which all teachers ought especially to cultivate and practice; it makes for caution and timidity in their associations by potential teachers.

The Constitution of the United States does not render the United States or the States impotent to guard their governments against destruction by enemies from within. It does not preclude measures of self-protection against anticipated overt acts of violence. Solid threats to our kind of government—manifestations of purposes that reject argument and the free ballot as the means for bringing about changes and promoting progress—may be met by preventive measures before such threats reach fruition. However, in considering the constitutionality of legislation like the statute before us it is necessary to

keep steadfastly in mind what it is that is to be secured. Only thus will it be evident why the Court has found that the Oklahoma law violates those fundamental principles of liberty "which lie at the base of all our civil and political institutions" and as such are imbedded in the due process of law which no State may offend. *Hebert* v. *Louisiana,* 272 U. S. 312, 316.

That our democracy ultimately rests on public opinion is a platitude of speech but not a commonplace in action. Public opinion is the ultimate reliance of our society only if it be disciplined and responsible. It can be disciplined and responsible only if habits of open-mindedness and of critical inquiry are acquired in the formative years of our citizens. The process of education has naturally enough been the basis of hope for the perdurance of our democracy on the part of all our great leaders, from Thomas Jefferson onwards.

To regard teachers—in our entire educational system, from the primary grades to the university—as the priests of our democracy is therefore not to indulge in hyperbole. It is the special task of teachers to foster those habits of open-mindedness and critical inquiry which alone make for responsible citizens, who, in turn, make possible an enlightened and effective public opinion. Teachers must fulfill their function by precept and practice, by the very atmosphere which they generate; they must be exemplars of open-mindedness and free inquiry. They cannot carry out their noble task if the conditions for the practice of a responsible and critical mind are denied to them. They must have the freedom of responsible inquiry, by thought and action, into the meaning of social and economic ideas, into the checkered history of social and economic dogma. They must be free to sift evanescent doctrine, qualified by time and circumstance, from that restless, enduring process of extending the bounds of understanding and wisdom, to assure which the freedoms

of thought, of speech, of inquiry, of worship are guaranteed by the Constitution of the United States against infraction by National or State government.

The functions of educational institutions in our national life and the conditions under which alone they can adequately perform them are at the basis of these limitations upon State and National power. These functions and the essential conditions for their effective discharge have been well described by a leading educator:

"Now, a university is a place that is established and will function for the benefit of society, provided it is a center of independent thought. It is a center of independent thought and criticism that is created in the interest of the progress of society, and the one reason that we know that every totalitarian government must fail is that no totalitarian government is prepared to face the consequences of creating free universities.

"It is important for this purpose to attract into the institution men of the greatest capacity, and to encourage them to exercise their independent judgment.

"Education is a kind of continuing dialogue, and a dialogue assumes, in the nature of the case, different points of view.

"The civilization which I work and which I am sure, every American is working toward, could be called a civilization of the dialogue, where instead of shooting one another when you differ, you reason things out together.

"In this dialogue, then, you cannot assume that you are going to have everybody thinking the same way or feeling the same way. It would be unprogressive if that happened. The hope of eventual development would be gone. More than that, of course, it would be very boring.

"A university, then, is a kind of continuing Socratic conversation on the highest level for the very best people you can think of, you can bring together, about the most important questions, and the thing that you must do to the uttermost possible limits is

198

to guarantee those men the freedom to think and to express themselves.

"Now, the limits on this freedom, the limits on this freedom, cannot be merely prejudice, because although our prejudices might be perfectly satisfactory, the prejudices of our successors or of those who are in a position to bring pressure to bear on the institution, might be subversive in the real sense, subverting the American doctrine of free thought and free speech." Testimony of Robert M. Hutchins, Associate Director of the Ford Foundation, November 25, 1952, in Hearings before the House Select Committee to Investigate Tax-Exempt Foundations and Comparable Organizations, pursuant to H. Res. 561, 82d Cong., 2d Sess.