In the Matter of JERVEY C. HAMILTON, Petitioner, against PAUL P. BRENNAN et al., as Commissioners of the Municipal Civil Service Commission of the City of New York, Respondents.

Supreme Court, Special Term, New York County, February 18, 1953.

*Bruce McM. Wright* and *James I. Watson* for petitioner.

*Denis M. Hurley, Corporation Counsel* (*Arthur H. Geisler* of counsel), for respondents.

HOFSTADTER, J. The petitioner is an honorably discharged veteran of World War II. During the war he served in the Navy both here and overseas. In 1951 he took a competitive examination for the position of patrolman in the New York City police department and, after having passed this examination, also passed the physical examination and was placed on the eligible list with a veteran's preference status. With the approval of the municipal civil service commission, for financial reasons, he thereafter temporarily declined an appointment as patrolman.

This was the situation when in January, 1952, the petitioner was directed to appear before a police lieutenant for interrogation as to his eligibility for the position of patrolman. He reported and was then asked about a political petition he had signed and a telegram he had sent in 1949 on behalf of Benjamin Davis, a former member of the city council of the City of New York. The interrogation was confined to the foregoing subject. Though at that time he had no clear recollection of the petition, he did not deny having signed it and gave an explanation to be touched on further. He, however, categorically denied that he had sent the telegram. Following this interrogation, he was instructed to explain by letter why he had signed the petition and the telegram. In a longhand letter dated January 28, 1952, sworn to before a notary, he freely admitted his signature on the petition, but stated he was " in ignorance of the political significance of signing it." He again said he had no knowledge of sending the telegram.

Later the petitioner was directed to show cause on June 30, 1952, why his name should not be removed from the eligible list for patrolman. This notice contained no charge nor did it specify the subject matter of the inquiry. In obedience to the notice the petitioner, on June 30, 1952, appeared without counsel before two members of the municipal civil service commission. After having been sworn, he was questioned by the commissioners about the petition and the telegram and also about communism. In substance, the petitioner reiterated in greater detail what he had already said in the letter. He denied that he had ever been a member of the Communist party or had ever attended a communist meeting. The minutes of the hearing conclude: " Disposition: Not qualified ", and on June 30, 1952, the very day of the hearing, the commission sent the petitioner written notification that he had been marked not qualified on the eligible list, pursuant to section 14 of the Civil

Service Law. No findings were made by the commission, nor does the notice state the grounds which impelled the commission to remove his name from the eligible list. These grounds appear only in the papers in answer to the present application.

In this proceeding the petitioner challenges the commission's action in thus pronouncing him unqualified and seeks an order annulling the action and restoring his name to the eligible list for patrolman.

The petitioner assails the commission's procedure. He urges that he was not afforded a fair hearing and that the failure to make findings vitiates the action taken. He argues, too, that his disqualification rests on his political opinions or affiliations and thus defies section 25 of the Civil Service Law. In view of the conclusion reached on the more fundamental question presented, I find it unnecessary to pass on these contentions.

The respondents' position is that the petitioner's admitted signing of the petition in behalf of Davis justified striking his name from the eligible list. The answering affidavit makes no reference at all to the telegram. No copy of the telegram has been produced and we are wholly in the dark as to its contents. We are not even told to whom it is supposed to have been sent. I regard the respondents' failure to mention the telegram in their answering affidavit as an abandonment of the telegram as basis for their determination. In any case, the telegram could not serve as a prop for their action. There is not even the semblance of proof to overcome the petitioner's flat denial of any part in it, whatever its nature. In the circumstances, the telegram is completely eliminated as a factor in the case and will not be mentioned again.

Since the petitioner's disqualification then rests solely on his signing of the petition, we turn to that paper. Its format is that of the usual nominating petition for public office. It is headed in large bold-faced type " COMMUNIST PARTY "; underneath in somewhat smaller type appear the words " INDEPENDENT NOMINATING PETITION ". Then follows in normal type the declaration prescribed by the Election Law that the signer is a duly qualified voter of the political unit for which the nomination for public office is made by the petition; that his residence is truly stated; and that he intends to support at the ensuing election and nominates the named person as a candidate for nomination for public office to be voted for at the November 8, 1949, election. The declaration ends with the statement that the signer selects the name " Communist Party "

as the name, and factory smokestack and sheaf of wheat as the emblem of the independent body making the nomination. The candidate nominated by the petition is Benjamin J. Davis, for the office of City Councilman, 21st Senatorial District of Manhattan. The petitioner's signature, the third on the sheet containing nine signatures, bears the date August 7, 1949. Parenthetically it may be observed that there was not then, or even today for that matter, any statute of the State which outlawed the Communist party or prohibited a member of the party from running for public office.

It is undisputed that Benjamin J. Davis had prior to 1948 been a Communist party member of the New York City Council and that on the date of the petition he was on trial with others in the United States District Court for the Southern District of New York on an indictment charging him with a violation of the Smith Act in conspiring to overthrow the Government of the United States by force and violence. He was convicted on October 13, 1949, and his conviction has been upheld on appeal.

While, as stated, the petitioner admits that he signed the petition on behalf of Davis, he denies that in so doing he intended to give support or express sympathy with the Communist party. The petitioner is a negro who was then living in Harlem. He says that at the time there was much publicity in the negro press about one Willie McGee, a negro condemned to death in Mississippi, and that he signed the petition to voice his protest against racial injustice. He asserts that he was requested to sign because he was a negro and Davis was a well-known negro, the first member of the race to become a New York City councilman. . Whatever the merit of this explanation — the answering affidavit states that the commission gives it no credence — it is at least not without interest that five other signers of the sheet, all living on the same street, have made affidavits that they were tricked into signing on the representation that the petition had to do with discrimination against negroes; that they were not told it was political; and that the top of the sheet bearing the name of the Communist party must have been turned over so as to be invisible when they signed. Inasmuch, however, as the commission has seen fit not to believe the petitioner's explanation and this administrative finding may not be lightly brushed aside, the case will be disposed of without taking the explanation into account.

We have then for decision the bald question whether the mere signing of the petition furnishes a rational basis for striking the petitioner's name from the eligible list for patrolman. It may be assumed for present purposes that no one has a natural or inherent right to public employment. (The oft-quoted remark of Mr. Justice Holmes in *McAuliffe* v. *New Bedford,* 155 Mass. 216, 220: "The petitioner may have a constitutional right to talk politics, but he has no constitutional right to be a policeman" dealt with restriction on the conduct of a man who already was a policeman, not with his right to become one in the first instance.) Still, as the Supreme Court of the United States said very recently in *Wieman* v. *Updegraff* (344 U. S. 183): "It is sufficient to say that constitutional protection does extend to the public servant whose exclusion pursuant to a statute is patently arbitrary or discriminatory."

Was the removal of the petitioner's name, in the circumstances, arbitrary? In our search for the correct answer we must be mindful of today's acute international situation and of the dangers of treachery from within. Nor may we overlook the vital function of the police as the guardian of law and order and the need for a thoroughly dependable personnel in the police department. We recognize, too, the restraint to be exercised in scrutinizing the action of an administrative body lest the court invade a field beyond its competence. These considerations, however, weighed singly or collectively, do not allow a court to shirk the plain duty of striking down official action which denies the individual a fundamental right given to him by the Constitution. Under the doctrine of *Wieman* v. *Updegraff* (*supra*), if the petitioner's exclusion from public employment was arbitrary, he has been denied such right.

In *Wieman* v. *Updegraff* (*supra*) the Supreme Court dealt with an Oklahoma statute which required every State officer and employee to take a loyalty oath, stating, among other things, that he was not affiliated directly or indirectly with the Communist party or with any agency, party, organization, association or group, officially determined by the Attorney General or other authorized agency of the United States to be a communist front or subversive organization, and within the five years immediately preceding the taking of the oath had not been a member of any such agency, party, organization, association or group. The court held the statute to offend due process because it classified, indiscriminately, innocent and

knowing affiliation with a proscribed organization or group. To visit disqualification upon one who had joined innocently, unaware of its activities and purposes, was ruled an assertion of arbitrary power.

In the case at bar there is no evidence that the petitioner was ever a member or otherwise identified with any subversive group. He makes oath now as he did before the commission that he is not a communist and has never been one. He swears that he is a loyal American who loves his country, that he has never been a member of any subversive organization, and neither subscribes to nor sympathizes with subversive doctrines. The record is barren of proof or anything even bordering on proof which militates against the truth of these sworn declarations. If innocent membership cannot be ground for disqualification from public employment, how can complete absence of membership justify it?

Of course, it is urged against the petitioner that, though he was not bound correctly to forecast the verdict of guilty returned more than two months after he signed the nominating petition, Davis' activity as a communist was so generally known that the petitioner must have been familiar with his record. Even so, it does not follow that the petitioner believes in the principles of the Communist party. He might have wished to see Davis in the city council for numberless reasons having nothing to do with communism. Unless every presumption is to be indulged against the petitioner, there is no reasonable basis for treating his signature on the petition as the equivalent of adherence to communism. Hitherto, the rule has not been to accept unfavorable presumptions as a substitute for evidence.

The respondents also lean on the communist doctrine which makes the practice of deception a legitimate instrument for the pursuit of communist aims. Their argument seems to run something like this: The petitioner denied that he knew the Davis petition was a communist petition or that, in signing it, he intended to support the Communist party. Since the policy of the communist is to practice deception, the petitioner's denial must be false. Therefore, he is a communist. There is no occasion to say what this argument might be worth if it originated in a single circumstance, other than the petition itself, tending to show that the petitioner was a communist or had subversive leanings. The record here is wholly devoid of anything of this kind, and the petitioner's denial, even if discarded as unworthy of belief, obviously cannot be converted into an

affirmation of what he has denied. In the circumstances, I regard this argument as little short of fanciful.

It is to be borne in mind also that at the hearing before the commission the petitioner answered freely every question put to him. However searchingly the record is studied, in the end there still remains against the petitioner nothing but his signature on the Davis petition. After anxious thought I am led to the clear conviction that this act alone does not and should not disqualify him for service as a police patrolman.

The effect of the petitioner's disqualification is far-reaching and almost terrifying. As the Supreme Court pointedly said in *Wieman* v. *Updegraff* (344 U. S. 183, *supra*): "There can be no dispute about the consequences visited upon a person excluded from public employment on disloyalty grounds. In the view of the community the stain is a deep one; indeed it has become a badge of infamy. Especially is this so in time of cold war and hot emotions when ' each man begins to eye his neighbor as a possible enemy.' " This threat to our liberties, engendered by such an atmosphere of suspicion (the subject of an illuminating address by Judge LEARNED HAND at the 86th Convocation of the University of the State of New York [October 24, 1952]), must give rise to grave apprehension. The indiscriminate condemnation of every unorthodox or non-conformist opinion as subversive can easily lead to the suppression of free speech. If we surrender the right to think and speak freely, we shall have lost our free society. The right extends to the unpopular as well as to the popular cause, and when that right is menaced, it must be vindicated, however loud the clamor and insistent the pressure for its denial; the courts may not readily be deterred from pronouncing as arbitrary official action resting on nothing better than unfounded suspicion.

Happily, we have not reached — and fervently we hope that we never shall — the awful " paradox " that may confront a democratic government in time of war — the need of curbing temporarily civil liberties in order to preserve them in the end. And though in the present world crisis, in order to assure national security and yet maintain basic freedoms which are the very fibre and fabric of our being, we are at times called upon to make decisions exceedingly fine, it remains forever clear that constitutional limitations may not be abridged to meet supposititious needs, at the caprice of administrative or other officials.

The petitioner's disqualification brands him as disloyal and may well ruin his future. If anything of substance justified the commission's determination, it could very properly be said that the petitioner's private interest must yield to the necessity of keeping subversives out of the public service, especially in so critical a field as the police department. But, since his exclusion is not so grounded, he should not be compelled to suffer the blight and humiliation it has inflicted upon him. Obviously, the present determination places no fetters on the powers of either the commission or the police commissioner properly called into play by anything the petitioner may do.

The determination that the petitioner is not qualified is accordingly annulled and the respondents are directed to restore his name to the eligible list for patrolman in the police department with veteran's preferential status. Settle order.