**Richard W. SEAL and Osie L. Robinson, Plaintiffs,**

**v.**

**David PRYOR, Governor of State of Arkansas; Willis B. Smith, Jr., Director of the Department of Public Safety, State of Arkansas; Hollis Spencer, Wade Tatum, and Howard Spinks, Commissioners of the Law Enforcement Training Academy; and Loyd Reese, Acting Commissioner of the Arkansas Law Enforcement Training Academy, Defendants.**

**No. LR–C–78–34.**

United States District Court, E. D. Arkansas, W. D.

Dec. 29, 1980.

making an initial designation, as the FEA held in *Mobil Oil Corporation.*

Philip E. Kaplan, Little Rock, Ark., for plaintiffs.

Debby Nye, Asst. Atty. Gen., State of Ark., Little Rock, Ark., for defendants.

## FINDINGS OF FACT

WOODS, District Judge.

1. On July 22, 1977 the plaintiffs, Richard W. Seal and Osie L. Robinson, were employees of the Arkansas Law Enforcement Training Academy (hereinafter ALETA) in Camden, Arkansas. Both had been employed by the academy as instructors for several years at the time of their discharge on July 22, 1977. Seal is a white male, and Robinson is a black male.

2. At all material times in this proceeding David Pryor was the Governor of the State of Arkansas. The Governor of the State of Arkansas, by statute, appoints the Director of the Department of Public Safety. At all relevant times herein that director was Willis B. Smith, Jr. ALETA is an agency of the Department of Public Safety. At the time of discharge of the plaintiffs, Kenneth Rogers was the director of ALETA. ALETA is an agency of the State of Arkansas. ALETA has a Board made up of three commissioners.

3. Class 77B met at ALETA between February 14, 1977 and March 25, 1977. It was during Class 77B that all of the activity which resulted in allegations against the plaintiffs occurred.

4. Sometime after the conclusion of Class 77B, one of the class members made a complaint to State Representative Bobby Newman. The telephone call concerned plaintiff Robinson and alleged that he, a black male, had used offensive language and gestures in the presence of a white woman. The academy director asked his assistant, Floyd Thomas, to make a discreet inquiry among class members to determine whether there was any validity to the allegation.

5. A report was made to Rogers by Thomas. The report was made orally and later reduced to writing. The report summarized interviews with the members of Class 77B. In these interviews the class members told Assistant Director Thomas that on numerous occasions Robinson had simulated masturbation while serving as instructor, and that Seals had unzipped his trousers on several occasions. Other lewd actions on the part of Robinson, as well as the use of profane and vulgar language by both men, were reported by one or more of those interviewed. On the basis of this report and from testimony adduced from other members of Class 77B, the court finds that the plaintiffs did on a number of occasions use vulgar and offensive language

while instructing the class and did use lewd, vulgar and offensive gestures as detailed in the above report.

6. As a result of the report, an oral reprimand was made by Rogers to both plaintiffs. The report from Thomas to Rogers was dated on or about March 28th and was in the form of an internal office memorandum.

7. On or about July 20, 1977 a newspaper article appeared in the *Arkansas Gazette* with regard to the allegations that Seal and Robinson had been involved in the alleged performance of lewd acts and the use of profane language. The story in the *Arkansas Gazette* also quoted at considerable length the March 28th memorandum wherein it was alleged that Robinson made gestures simulating an act of masturbation which he repeated day after day in front of basic training classes. The story also stated that Seal, on the other hand, was alleged to have unzipped the front of his trousers on several occasions in front of his classes.

8. As a result of the allegations made against Seal and Robinson, defendant Pryor ordered defendant Smith to summon Rogers, Seal, and Robinson to a meeting in the Governor's office on the morning of July 22, 1977. That meeting was held at which Pryor, Smith, Seal and Robinson were present. In addition, a governor's aide, Steve Clark, was present, as well as the director of the Arkansas State Police, Doug Harp. The defendants have admitted that the plaintiffs were not informed of the purpose of the meeting although they were told that their presence was required. Defendants admit that the plaintiffs were not afforded an opportunity to confront witnesses against them at the July 22, 1977 meeting. Defendants admit that neither plaintiff had an attorney at the meeting.

9. At the meeting in Governor Pryor's office, the plaintiffs were given an opportunity to explain and demonstrate their actions. Mr. Robinson then carried out a simulated masturbation catching the imaginary semen in his hands and throwing it in the direction of Governor Pryor. Mr. Seal turned his back on Governor Pryor and the others, unzipped his fly and immediately turned around as if he held his penis in his hands. At the meeting Governor Pryor and Mr. Smith examined the critiques of the members of Class 77B prepared at the end of the class. One-third of these critiques indicated lewd and obscene language and gestures by the plaintiffs, which were offensive to at least a substantial portion of the class.

10. At the time of the meeting on July 22nd, no investigation had been made by either the Arkansas State Police or the Office of the Governor of the State of Arkansas. The meeting lasted for most of the day, although Rogers and the two plaintiffs were only in the meeting for approximately one hour. At the conclusion of the day's deliberations, defendant Pryor, without identifying them by name, announced to the press that both plaintiffs had been fired and that Rogers had been relieved of his post as director of ALETA.

11. Subsequent to the meeting on July 22nd, plaintiff Seal wrote to Hollis Spencer, chairman of the ALETA Board, and requested a hearing. This letter, dated September 6, 1977, was sent by Seal's counsel. The request was neither granted nor rejected; it was merely not responded to. Plaintiff Robinson never requested a hearing before the ALETA Board.

12. On August 21, 1977 Kenneth Rogers, then the former director of ALETA, wrote Seal a letter in which he stated that he had "received no information which specifically identified the offensive and vulgar language allegedly used by [Seal] while teaching a class at the Arkansas Law Enforcement Training Academy." Also on August 21, 1977 Rogers wrote Seal and stated that Seal was considered by him to be a "Training Instructor and Supervisor who made a significant contribution to the academy and police training in Arkansas." He went on to say that Seal's official record "does not show what I consider to be your greatest assets. They are ambition, initiative, ingenuity and loyalty."

13. Governor Pryor testified that neither plaintiff was told that their positions

were in jeopardy or that discharge was being considered as a result of the activity and language alleged against them. He testified that he could only assume they felt that their actions were being closely scrutinized and questioned. The Court finds that plaintiffs knew the purpose of the meeting in Governor Pryor's office was related to the conduct for which they had received an oral reprimand and which was the subject of the above-mentioned newspaper article of July 20.

14. The court finds that the plaintiffs did on occasion use vulgar and offensive language and gestures in classes at the Arkansas Law Enforcement Training Academy. While a small part of the language may have served a legitimate instructional purpose, the vulgar and offensive gestures served no instructional purpose whatsoever.

15. The activities of the plaintiffs came to public attention through an article in the *Arkansas Gazette* on July 20 and a follow-up article on July 21, 1977, which mainly dealt with other subjects. These articles were precipitated by the Gazette's having received an anonymous copy of the Thomas memorandum of March 28, summarized, *supra*. There is no proof but only speculation as to the identity of the person who sent the memorandum to the *Gazette*. Kenneth Rogers testified that he kept the memorandum locked in his desk. Although the Gazette articles of July 20 and July 21 stigmatized the plaintiffs and seriously damaged their standing and reputation in the community, there is no proof that any state official gave the March 28, 1977 memo to the *Arkansas Gazette*. Indeed, the proof indicates that Kenneth Rogers, Director of ALETA, made every effort to conceal plaintiffs' activities in respect to Class 77B. Governor Pryor and Director of Public Safety Smith had no knowledge of these activities until the appearance of the *Arkansas Gazette* news story of July 20, 1977.

16. The plaintiff introduced a copy of the Grievance Procedure Flow Chart, Department of Public Safety. This chart states: "A formal procedure is neither desirable for employees occupying executive, administrative or professional positions as defined by Act 932 of 1975. However, all such employees should feel free to discuss any problem or complaints with each level of management, including the Agency Director, in an effort to resolve such problems or complaints in a way which will benefit the operation of the department." Under the above-mentioned Act, Seals was classified as an administrative officer (Public Safety Training Academy Staff Administrator, Grade 21, Class Code 943Z). Robinson was classified as a training Instructor II, Grade 16, Class Code E072. While the latter is not an administrative classification under Act 932 of 1975, he was at least a professional employee. The court finds that the grievance procedure was not applicable to either employee.

17. The decision to dismiss the plaintiffs was the joint decision of Governor Pryor and the Director of Public Safety, Willis B. Smith.

18. There was no serious factual dispute at the hearing conducted in the Governor's office as to the language or actions of plaintiffs in serving as instructors in Class 77B. Plaintiffs freely and frankly admitted what they had said and done.

19. At the hearing on July 22, 1977, plaintiffs were given the opportunity by Governor Pryor and Public Safety Director Smith to explain and justify their actions, which they sought to do.

20. Plaintiffs were discharged by Governor Pryor and Director Smith for good cause.

21. Plaintiffs had not entered into written contracts of employment with the State of Arkansas.

22. Plaintiffs were made no promises, oral or written, that they would continue in the employment of the State of Arkansas for any specific time. There was no clearly implied promise of continued employment with respect to either plaintiff.

## CONCLUSIONS OF LAW

Plaintiffs contend that they were deprived of their property and/or liberty

without Fourteenth Amendment due process. There are thus three issues to be determined in this case. They are as follows: (1) Did the plaintiffs have such a property interest in their continued employment as to entitle them to procedural due process under the Fourteenth Amendment? (2) Did the plaintiffs have liberty interests which entitled them to such procedural due process? (3) Assuming either of these interests was protected, were plaintiffs afforded procedural due process? If the state prevails on the first two issues, it is unnecessary to reach the third.

■ *Property interests.* The Supreme Court pointed out in *Board of Regents v. Roth*, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972) that "the range of interests protected by procedural due process is not infinite." In that case the court held that a non-tenured professor at a state institute hired for a fixed term could be dismissed at the end of the term without explanation and without any hearing whatsoever. Tenured professors are protected. *Slochower v. Board of Education*, 350 U.S. 551, 76 S.Ct. 637, 100 L.Ed. 692 (1955). So are state employees under contract. *Wieman v. Updegraff*, 344 U.S. 183, 73 S.Ct. 215, 97 L.Ed. 216 (1952). Even when a teacher is without tenure or a formal contract, he has a Fourteenth Amendment protection if there is a clearly implied promise of continued employment. *Connell v. Higginbotham*, 403 U.S. 207, 91 S.Ct. 1772, 29 L.Ed.2d 418 (1970). "Property interests, of course, are not created by the Constitution. Rather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." *Board of Regents v. Roth, supra*, 408 U.S. at 577, 92 S.Ct. at 2709. The importance of state law was made explicit in *Bishop v. Wood*, 426 U.S. 341, 96 S.Ct. 2074, 48 L.Ed.2d 684 (1976).

A reference to state law is fatal to plaintiffs' claim that they have been deprived of a property interest. Personnel of the De-partment of Public Safety serve at the pleasure of the Director of the Department of Public Safety. Ark.Stat.Ann. § 5–914(3) (Repl.Vol.1976). The Arkansas Law Enforcement Training Academy established by statute in 1963 was transferred to the Department of Public Safety in 1971 as one of its divisions. Ark.Stat.Ann. §§ 42–701 et seq. (Repl.Vol.1977). The Department of Public Safety is not a member of the State Merit System, nor do the employees of the Department of Public Safety, as a whole, become members of any civil service organization. The Arkansas Law Enforcement Training Academy has no specific statutory scheme outlining a procedure for a discharged employee to lodge an appeal. In contrast, the Arkansas State Police, as a division of the Department of Public Safety, have an expressed statutory authority for the discharged employee to bring an appeal within ten days to the State Police Commission. Ark.Stat.Ann. § 42–406(d)(Repl.Vol.1977). On March 2, 1977 prior to the operative events in this case, the Department of Public Safety did adopt a grievance procedure permitting dissatisfied employees to be heard by their supervisors in a five-step grievance process. An examination of this procedure, as outlined in plaintiffs' exhibit nineteen (19), would not seem to confer job tenure, contractual employment rights or even any expectation of continued employment. At any rate the grievance procedure by its terms excludes the employment categories to which these men belonged. Admittedly, there was no contract of employment. The evidence is totally devoid of any "clearly implied promise of continued employment." The contention that plaintiffs had a property interest in their positions as instructors at the police academy is without merit. The state's position is supported by several cases from this circuit. A Chief of Police serving at the will of the City Manager has no property interest in his employment. *Owen v. City of Independence, Missouri*, 421 F.Supp. 1110 (D.C.1976) aff'd in part, rev'd in part 560 F.2d 925 (8th Cir. 1977), vacated 438 U.S. 902, 98 S.Ct. 3118, 57 L.Ed.2d 1145 (1978), on remand, 589 F.2d 335 (8th Cir. 1978),

reversed on other grounds, 445 U.S. 622, 100 S.Ct. 1398, 63 L.Ed.2d 673 (1980). An air force reserve officer was subjected to summary discharge when his commission was "at the pleasure of the President." *Ampleman v. Schlesinger*, 534 F.2d 825 (8th Cir. 1976). A referee of the Arkansas Workmen's Compensation Commission could be summarily dismissed without notice or hearing by members of the Commission, *Diles v. Woolsey*, 468 F.2d 614 (8th Cir. 1972). Where a teacher's employment contract was not renewed by the school board, ostensibly because of her service as an election official contrary to the wishes of the school superintendent, she was not entitled to procedural or substantive due process under the Fourteenth Amendment. *Evans v. Page*, 516 F.2d 18 (8th Cir. 1975). See also, *Freeman v. Gould Special School Dist.*, 405 F.2d 1153 (8th Cir. 1969).

■ *Liberty interest.* In order for the plaintiffs to prevail on their argument with respect to their liberty interests, they must show that the stigmatizing information was false and that state officers or agents were its source. *Quinn v. Syracuse Model Neighborhood Corp.*, 613 F.2d 438 (2d Cir. 1980). Here the plaintiffs have failed on both counts. Unfortunately for them, the stigmatized reports were true. As a matter of fact, the plaintiffs frankly admitted the substantial truth of the allegations, although they now seek to explain and justify them. The recent Supreme Court case of *Codd v. Velger*, 429 U.S. 624, 97 S.Ct. 882, 51 L.Ed.2d 92 (1977) is directly in point. Failure to give a policeman a termination hearing did not violate due process, since the report of his suicide attempt was apparently true. The court ruled that the purpose of a post-termination hearing was to provide the person with an opportunity to clear his name. When the employee does not challenge the substantial truth of the defaming allegations, such a hearing is pointless. In the words of the Supreme Court, "if the hearing mandated by the Due Process Clause is to serve any useful purpose, there must be some factual dispute between an employer and a discharged employee which has some significant bearing on the employee's reputation." 429 U.S. at 627, 97 S.Ct. at 884. The sole purpose of the hearing is to provide the person with an opportunity to clear his name. "If he does not challenge the substantial truth of the material in question, no hearing would afford a promise of achieving that result for him." 429 U.S. at 627–28, 97 S.Ct. at 884.

Instead of denying that they engaged in the conduct which resulted in their dismissal, plaintiffs seek to explain it away by testifying that other instructors engaged in similar conduct, that it was only a type of horseplay, that it was some type of private joke with a member of the class, or that it was a necessary concomitant of their instruction technique. We again advert to *Codd v. Velger, supra*, where the court noted that "respondent has at no stage of this litigation affirmatively stated that the [suicide] 'attempt' did not take place as reported. The furthest he has gone is a suggestion by his counsel that '[i]t might have been all a mistake, [i]t could also have been a little horseplay.' This is not enough to raise an issue about the substantial accuracy of the report." 429 U.S. at 628, 97 S.Ct. at 884.

*Codd v. Velger, supra* also makes clear that another element must be present before the liberty interest is violated. "Only if the employer creates and disseminates a false and defamatory impression about the employee in connection with his termination is such a hearing required." 429 U.S. at 628, 97 S.Ct. at 884. Here there is no proof that the State of Arkansas or any of its agents was the source of the derogatory information. It came from a newspaper story via an anonymous source. Contrary to publicizing the information, the head of the Academy did his best to keep the whole affair quiet. He locked the initial investigative report in his desk and administered only a private oral reprimand to plaintiffs. Until the newspaper publicity, both the Governor and the Director of the Department of Public Safety were unaware of plaintiffs' conduct. It was only *after* the appearance of the July 20th article in the *Arkansas Gazette* that these officials took

action. "Further the offending governmental entity or actor must make these false and stigmatizing charges 'public'." *Quinn v. Syracuse Model Neighborhood Corp., supra* at 447.

The dismissal of these plaintiffs by their departmental superior and the Governor of Arkansas was simply a personnel decision. But it was not lightly made. Plaintiffs were given an opportunity to fully explain their actions by Governor Pryor and Director Smith. The conference in the Governor's office required most of the day. The following testimony of Governor Pryor in his evidentiary deposition is corroborated by other testimony in the case:

Q. What was the response of Mr. Seal and Mr. Robinson and Mr. Rogers to your decision?

A. I do not recall the response of Mr. Rogers. I recall very well the response of Mr. Robinson and Mr. Seal, who came forward and thanked me for giving them the opportunity to express their side of the story and to answer the allegations, and they stated that they felt that the decision had been made after a proper opportunity to express themselves. I am not saying that they were happy with the ultimate decision, but they did thank me for the opportunity of hearing them out especially for that length of time. (Pryor depo. 24)

While we do not consider the personnel decision made in this case to have been either incorrect or ill-advised, the following statement of the Supreme Court in *Bishop v. Woods, supra* is most apposite:

The federal court is not the appropriate forum in which to review the multitude of personnel decisions that are made daily by public agencies. We must accept the harsh fact that numerous individual mistakes are inevitable in the day-to-day administration of our affairs. The United States Constitution cannot feasibly be construed to require federal judicial review for every such error. In the absence of any claim that the public employer was motivated by a desire to curtail or to penalize the exercise of an employee's constitutionally protected rights, we must presume that official action was regular and, if erroneous, can best be corrected in other ways. The Due Process Clause of the Fourteenth Amendment is not a guarantee against incorrect or ill-advised personnel decisions. 426 U.S. 349–50, 96 S.Ct. 2080.

It is apparent from the testimony in this case that the responsible state officials did not want to dismiss these men. They were excellent instructors, popular with their co-workers and with a majority of their students. They were committed to law enforcement careers. The head of the Academy tried his best to mute the criticism aroused by their actions and to conceal the matter from a public airing. A leak occurred, and the conduct of plaintiffs was given front-page play in a major newspaper of statewide coverage. This story, while unfortunate from the plaintiffs' standpoint, was undeniably accurate. The Governor and Director Smith could hardly be expected to condone the reported conduct, but they did give plaintiffs every opportunity to explain and justify it.

While we do not reach the issue of whether the conference in the Governor's office constituted procedural due process, it is obvious that the plaintiffs were given a fair and free opportunity to clear their names. *Codd v. Velger, supra* 429 U.S. at 627, 97 S.Ct. at 884.

In his complaint the plaintiff Robinson raised the issue of racial discrimination in his discharge. There is no proof of such, and Robinson candidly admitted on the stand that race played no part in his discharge. The plaintiffs also in the pleadings raised an equal protection issue on the ground that other instructors were also guilty of similar conduct. While it might be found from the proof that other instructors were guilty of some indiscretions in their use of profane language, there is no substantial evidence that any of them engaged in improper language or conduct on the scale of these plaintiffs. Clearly the conduct of the other instructors did not

precipitate the widespread complaints from members of Class 77B.

The relief sought by plaintiffs in their complaint is denied, and their complaint is dismissed.