CAMILO ARCELAY RIVERA, Plaintiff and Appellant, v. POLICE SUPERINTENDENT OF PUERTO RICO, SALVADOR RODRÍGUEZ APONTE, Defendant and Appellee.

No. R-66-277.    Decided June 30, 1967.

*S. L. Lagarde Garcés* for appellant. *J. B. Fernández Badillo, Solicitor General,* and *J. F. Rodríguez Rivera, Deputy Solicitor General,* for appellee.

Second Division composed of Mr. Justice Belaval, as Chief Judge of Division, Mr. Justice Hernández Matos, Mr. Justice Santana Becerra, and Mr. Justice Dávila.

MR. JUSTICE SANTANA BECERRA delivered the opinion of the Court.

The Police Superintendent discharged appellant Camilo Arcelay Rivera in an undated letter the contents of which are copied below:

"Mr. Camilo Arcelay Rivera
Supervisor of Technicians of Identification
c/o Dean of Academy
Gurabo, Puerto Rico

"Sir:

"The Office of the General Inspector has made an investigation of your conduct as a civil employee of this Agency.

"It appears from that investigation that on April 26, 1966 you performed technical tests on ballistics for the use of the counsel for the defense in a case of the Commonwealth of Puerto Rico against a citizen.

"The investigation also shows that during the days of May 4, 5, 6, and 9 of 1966, you appeared in the Superior Court of Mayagüez as expert of defense counsel for Mr. Enrique Carlo Aymat, and there you argued with the experts of the prosecutor, who are officers of the Police, defending the interests of the accused, and you participated as said expert in a stipulation which was finally approved by the parties and was submitted to the consideration of the courts and members of the jury. The investigation also reveals that you were not summoned by the court to testify in this case, and that you were retained by counsel for the defense to act as said expert, for which you would receive a fee.

"It has been established that in preferring the interests of the defendant to those of the Commonwealth of Puerto Rico, you have shown your incapacity to continue in the office you hold as Supervisor of Technicians of Identification of the Police.

"In view of the foregoing I have no other alternative but to decree your removal from the office you hold in the Police, to become effective at the time you receive this letter.

"Truly Yours,
(sgn.) "Salvador Rodríguez
"SALVADOR RODRÍGUEZ
"Superintendent"

On May 31, 1966, the appellant answered the former communication and stated that at no time had he preferred the interests of a defendant to the interests of the Commonwealth of Puerto Rico, and that he had not defended the interests of any particular accused, and that he had served in this case as in all cases, in the interest of truth and justice; that he requested and obtained a leave of absence for the days he was absent, for which reason no expenses had been caused to the People of Puerto Rico; that in the past, and at the request of counsel for the defense, he had

appeared at trials, among others, the one filed in the Superior Court, Guayama Part, for the crime of murder against Jim Correa, and the one filed in the Superior Court of Aguadilla against Rafael Dones Arroyo and Benigno Velázquez Lasalle, cases known as those against the MAPA; that those cases gave rise to communications of recognition of his work, in spite of appearing as witness for the defense, to the then Superintendent Salvador T. Roig, which cases were necessarily to be found in the files, with date of April 30, 1965; that it was not till May 6, 1966, that the People of Puerto Rico requested the appearance in court of the experts of the Police, and on the 9th, when they appeared, after a conference with the appellant and León Lyon, a stipulation was prepared, drafted and signed which is also signed by him, and by other experts of the Police, by Lyon and by the prosecutors and counsel for the defense; that he served truth, without hiding anything before any authority, and his services to truth and justice were confirmed and subscribed by the other officers, experts of the Police, culminating in the stipulation without any of the experts having to sit on the witness stand to testify.

He requested the Superintendent to reconsider his decision since the appellant had not broken any rule or law. He also requested a hearing where he could appear, for a better understanding of the facts. The Superintendent affirmed the discharge by letter of June 3, 1966, without hearing the appellant.

The stipulation to which appellant referred in answer to his dismissal, and which was considered in the criminal trial mentioned, establishes that after experts of the People, Carlos R. George and Jaime Rivera Quiñones, and the experts for the defense, Camilo Arcelay and León Lyon, the Prosecutors Luis H. Rivera Torres and José A. Andreu García, and the attorneys Amadeo Nazario Janer and S. L. Lagarde Garcés conferred, they stipulated:

"(a) That at a distance of 37 feet from where the target is fired at, aiming at said target, the result of the shot concentration would be 90% of the cartridge shot and that they would be highly concentrated and joined in the place where the target is placed.

"(b) The wounds received by the child show that the shot was fired at a greater distance than 80 feet.

"(c) That at a distance which fluctuates between 80 feet and 150 feet without aiming at the child, the latter could have received the injuries he did receive.

"(d) That the greater the distance, the greater is the dispersion of fragments.

"(e) That a cartridge 12 gauge contains 132 shots.

"(f) That at a distance of more than 150 feet, the shots have no effect.

"(g) According to the place where the child received the injuries and to their dispersion, the shot could have been fired upwards or towards the side where the child was located."

The foregoing constitutes the set of facts on which this proceeding is based.

The appellant appealed to the Police Commission, case No. 346 and, on June 9, 1966, the Commission declared itself without jurisdiction since appellant was not a member of the Police force of Puerto Rico.[1]

There is in the record the decision of the Personnel Board No. 279, dated June 13, 1966, in which it is ruled that, "It appearing from the appeal presented by Mr. Arcelay Rivera, through Mr. S. L. Lagarde Garcés on June 2, 1966,

---

[1] The Police Act of Puerto Rico, Act No. 77 of June 22, 1956, provides in its § 11 which creates the Police Commission, that the Commission will act as "appellate" body to hear and pass upon all appeals filed by police members. Police members as defined by § 2 of said Act, include only the personnel directly performing tasks connected with the maintenance of public order and the protection of the life and property of the citizens, and other like duties. Section 6 provides that the police members shall be included within the exempt service and the rest of the personnel shall be included within the noncompetitive service, under the provisions of the Personnel Act.

There is no controversy as to the appellant not being a police member, and to his performing his work in the noncompetitive service.

that the appellant is an employee in the noncompetitive service, the appeal is denied for lack of jurisdiction."

On July 19, 1966, appellant filed a petition for mandamus in the San Juan Part of the Superior Court against the Police Superintendent, requesting to be reinstated in his permanent employment as Supervisor of Technicians of Identification and back wages. On August 19, 1966, the court rendered judgment denying the petition for mandamus, relying on *Rodríguez* v. *Buscaglia*, 63 P.R.R. 470 (1944). In *Rodríguez* we agreed with the reasoning of the trial court that since the plaintiff-employee was not within the Classified Civil Service, his office was at the mercy of the defendant therein, without it being necessary for his removal to file charges, and therefore "the existence of just or unjust cause are immaterial to his removal."

Since the decision in 1944 of *Rodríguez* v. *Buscaglia* new rules of public policy both legislative and judicial have been sanctioned with regard to the rights of the employee in the government public service which deserve at least some analysis, before flatly disposing of the issue by merely saying that there is no inherent or constitutional right to enjoy a public employment or that, as believed by the trial court and the Personnel Board, the removal of the appellant does not merit further consideration because he belongs to the noncompetitive service.

—I—

In a global evaluation of public service in the light of more advanced standards of service, the Personnel Act of 1947 adopted, in addition to the Exempt Service and the Competitive Service—corresponding to Nonclassified Service and Classified, respectively, of the former legislations—a third category of employment or service, Noncompetitive Service. The Act has not defined this service, nor the other

two, nor are they defined by the regulations with force of law, but the Legislature provided, and from time to time has provided, which offices are included in the Noncompetitive Service. Section 8 (b) of Act No. 345 of May 12, 1947, and its subsequent amendments.

To a large extent this service resembles more the Competitive than the Exempt Service. As in the former, the employees in the Noncompetitive Service are included in the scientific and uniform classification plan of § 10 of the Act, and are subject to the allocation and reallocation of offices under said plan with the protection which the following § 11 offers; they are included in the uniform pay plan which § 13 provides, with the advantages of the same and subject to the pay schedule which have been provided and are being provided by the Legislative Assembly; they are covered by the same system of performance ratings for services based upon standards of *efficiency*—§ 27; have the same rights in consideration of leaves of absence and vacations, sick leaves, leaves with or without pay or special leaves which the Competitive Service has—§ 28. See § 29 (d) as to the action against the appointing authority in the situation foreseen there; § 3 of Act No. 9 of March 7, 1951, relieving both services from certain obstacles in order to occupy other services; the right of reinstatement of the subsection (a), § 2 of Act No. 14 of May 3, 1963, § 34 which compels the employees to make all the reports which the Director requires, in connection with the employees of Competitive as well as with the employees of Noncompetitive Service.

Without a doubt there are three essential elements in the system of governmental service for its efficient functioning—the scientific plan of classification of offices and employments; the plan of uniform and equal pay depending on the nature and importance of the function exercised, and the individual qualification of merits based on efficiency—the Act has placed the Noncompetitive and the Competitive

services on the same footing. Originally, the division of offices or employments appointed to the Noncompetitive Service was not very extensive, §. 8(b) of the Act. By virtue of the mechanism that § 8(e) provided, and by resolution of the Legislative Assembly, in separate acts, this service has today acquired a greater scope.

In an attempt to explain it, one could say that this intermediate category blends the necessity which the government has of functioning with certain facility and freedom in particular positions or employments, and at the same time, to offer greatest possible protection and stability to the public servant for more efficient works, this being characteristic of the Competitive Service. Thus, the provisions of the Act, which in the basic aspect of the system places both services on the same footing, lead us to understand that it could be the desire of the Legislature that the employee in the Noncompetitive Service enjoy, as much as possible, a relative permanency or indefinite employment, similar to that which the Competitive offers, since in the long run the excellence of the work rendered is implied in it.

We acknowledge and accept that in the Noncompetitive Service a considerable amount of offices or employments are needed which concern only the appointing authority as to his duty for reasons of extreme confidence or because they exercise guiding functions, which services the appointing authority can disregard according to his better judgment. As to the other persons of the Noncompetitive Service, it seems that the Legislature, in placing both services on the same footing in the basic and most important aspects of the system, did not conceive the Noncompetitive Service as a day to day tenure with no stability, since if such were the case, many rules of the act which cover this service could not be applied.

Section 31 of the Act provides that the regular officials and employees in the Competitive Service may be removed

only for just cause and upon the preferment of charges. Later on, the causes for removal are enumerated, among others. It also provides the procedure to be followed by the appointing authority. From the removal ordered by the latter, the employee may appeal to the Board, and, ultimately, may apply for a review in the Superior Court. As to discharges or removals of the employee in the Noncompetitive Service, the Act does not make any statement.

Nevertheless, § 6(a) grants power to the Personnel Board to *"investigate"* and to decide on appeal the following matters: dismissals, suspensions, terminations. . . . In addition, the Act has granted the Board an extensive tutelary power over this system, greater than the mere adjudicator power it has in disputable matters. It can advise the Governor and the Director on problems concerning personnel, advise on the improvement of rules pertinent to service personnel; it has extensive power of investigation as to the administration of the personnel, and it has the authority to make the pertinent recommendations to the Governor or to the Director. It can make recommendations to the Legislative Assembly on the administration of the personnel and recommendations for the improvement of the system. Even in controvertible cases, in which it acts as an adjudicator organism, it has the authority of investigating by itself the facts, without thus depriving its members from the authority of deciding. The rule, which it adopts in the exercise of its ample authorities, has force of law once approved by the Governor and promulgated, and it has express power to regulate all the working conditions of the employees in the Competitive and Noncompetitive services.

The fact that the Act is silent as to dismissals or removals in the Noncompetitive Service does not prevent the Board from knowing and regulating such an important aspect as this for the stability and efficiency of the system. Without any doubt, it can be object of its power of investigation and of

advice to the Governor, Director or Legislative Assembly. With greater reason if one has in mind that § 15 of the Act authorizes the Director to reject the application of any person for admission to a test, or to remove the name of any person from a list, or may refuse to certify the name of any person who has been removed from public service; and that § 647– 203 of the Rules, with force of law, provides that any employee who has been removed from his position in the Commonwealth service may be considered ineligible for appointment to competitive and noncompetitive service positions. See the provisions of the Municipal Act which renders persons who have been removed from public service ineligible for municipal offices.

We believe that in some way the Board could have investigated this case. Nevertheless, we are not here to review the refusal of the Board to take cognizance of this specific matter. We therefore, should confront the issue within the judicial proceeding of mandamus which was chosen.

Appellant sustains that his summary dismissal violates the due process of law because he has been stamped with defaming and degrading disloyalty, and with incapacity for public service by charging him, in his removal with preferring the interests of a particular person to those of the State, and that it is also contrary to the dogma that the dignity of the human being is inviolable which is so consecrated in § 1 of the Bill of Rights of the Constitution of the Commonwealth of Puerto Rico, Art. II. He maintains that even when the employee in the Noncompetitive Service can be removed by will of the appointing authority, this should not hurt his dignity and integrity without an opportunity of defending himself.

Although it was in a different set of facts, but as an expression of general rule, it was said in *Wieman* v. *Updegraff* by Judge Clark, 344 U.S. 183, p. 191: "We are referred to our statement in *Adler* that persons seeking employment in

the New York public schools have 'no right to work for the State in the school system on their own terms. [citation] They may work for the school system upon the reasonable terms laid down by the proper authorities of New York.' 342 U.S., at 492. To draw from this language the facile generalization that there is no constitutionally protected right to public employment is to obscure the issue. . . . We need not pause to consider whether an abstract right to public employment exists. It is sufficient to say that constitutional protection does extend to the public servant whose exclusion pursuant to a statute is patently arbitrary or discriminatory."

Subsequently, in *Slochower* v. *Board of Education*, 350 U.S. 551, Judge Clark himself sets forth as a general rule (p. 555) : "To state that a person does not have a constitutional right to government employment is only to say that he must comply with *reasonable, lawful,* and *nondiscriminatory* terms laid down by the proper authorities. . . . But in each of these it was emphasized that the State must conform to the requirements of due process. [Reference to that set forth in the *Updegraff* case, *supra,* follows.]"

On page 559 : "There has not been the 'protection of the individual against arbitrary action' which Mr. Justice Cardozo characterized as the very essence of due process. [citation] This is not to say that Slochower has a constitutional right to be an associate professor of German at Brooklyn College. That State has broad powers in the selection and discharge of its employees, and it may be that proper inquiry would show Slochower's continued employment to be inconsistent with a real interest of the State. But there has been no such inquiry here. We hold that the summary dismissal of appellant violates due process of law."[2]

---

[2] Consult also: *Schware* v. *Board of Bar Examiners*, 353 U.S. 232, at page 238: "A State cannot exclude a person from the practice of law or from any other occupation in a manner or for reasons that contravene the Due Process or Equal Protection Clause of the Fourteenth Amendment.

*Cafeteria Workers* v. *McElroy*, 367 U.S. 886, offers vast considerations on the problem. It upheld the governmental action, which restricted an employee from access to the cafeteria where she worked, for reasons of security, the cafeteria being a private store in a Naval Factory which constructed secret weapons. There was no notification of charges or of a hearing before depriving her of access to her job. It was said at page 894:

"The question remains whether Admiral Tyree's action in summarily denying Rachel Brawner access to the site of her former employment violated the requirements of the Due Process Clause of the Fifth Amendment. This question cannot be answered by easy assertion that, because she had no constitutional right to be there in the first place, she was not deprived of liberty or property by the Superintendent's action. 'One may not have a constitutional right to go to Bagdad, but the Government may not prohibit one from going there unless by means consonant with due process of law.' [citation] It is the petitioners' claim that due process in this case required that Rachel Brawner be advised of the specific grounds for her exclusion and be accorded a hearing at which she might refute them. We are satisfied, however, that under the circumstances of this case such a procedure was not constitutionally required. . . ."

(P. 897)

"Nothing that was said or decided in *United Public Workers** or *Wieman* would lead to the conclusion that Rachel Brawner could not be denied access to the Gun Factory without notice and an opportunity to be heard. Those cases demonstrate only that the state and federal governments, even in the exercise of their internal operations, do not constitutionally have the complete freedom of action enjoyed by a private employer. But to acknowledge that there exist constitutional restraints upon state

---

[citations]" (Footnote p. 239): "We need not enter into a discussion whether the practice of law is a 'right' or 'privilege' . . . . It is sufficient to say that a person cannot be prevented from practicing except for valid reasons. Certainly the practice of law is not a matter of the State's grace. [citation]" And see the concurrence of Judge Frankfurter, 353 U.S. at page 249; *Konigsberg* v. *State Bar*, 353 U.S. 252, 262 *et seq.*

* *United Public Workers* v. *Mitchell*, 330 U.S. 75.

and federal governments in dealing with their employees is not to say that all such employees have a constitutional right to notice and a hearing before they can be removed. We may assume that Rachel Brawner could not constitutionally have been excluded from the Gun Factory if the announced grounds for her exclusion had been patently arbitrary or discriminatory—that she could not have been kept out because she was a Democrat or a Methodist. It does not follow, however, that she was entitled to notice and a hearing when the reason advanced for her exclusion was, as here, entirely rational and in accord with the contract with M & M.

"Finally, it is to be noted that this is not a case where government action has operated to bestow a badge of disloyalty or infamy, with an attendant foreclosure from other employment opportunity. [citations] All this record shows is that, in the opinion of the Security Officer of the Gun Factory, concurred in by the Superintendent, Rachel Brawner failed to meet the particular security requirements of that specific military installation. There is nothing to indicate that this determination would in any way impair Rachel Brawner's employment opportunities anywhere else. . . . For all that appears, the Security Officer and the Superintendent may have simply thought that Rachel Brawner was garrulous, or careless with her identification badge."[3]

■ Against this background, we examine the question involved herein. It is clear that the fact that the Personnel statute does not provide for removals from the Noncompetitive Service with previous preferment of charges and the opportunity to be heard, as it is done in the Competitive Service, nor the rules of the Board so provide, does not convert appellant's removal on that account alone, in one on the margin of the due process of law. The system is constitutional. It would also be somewhat exaggerated to maintain that appellant was stamped with an infamous label on his person and tainted in his dignity, manliness and citizenship because

---

[3] *Cf. Nelson* v. *Los Angeles County,* 362 U.S. 1; *Peters* v. *Hobby,* 349 U.S. 331; *Adler* v. *Board of Education,* 342 U.S. 485; *Garner* v. *Board of Public Works,* 341 U.S. 716.

of the statement contained in the letter of dismissal that he had preferred private interests to those of the government, this being taken in the light of the facts which gave rise to his removal. This was more or less a conclusion of the Superintendent inferred from those facts.

As to reasonability, it should be clear that if appellant had been removed for complying with the summons of the Court, even if his intervention had been in favor of the defendant and against the People, we would have decreed that his dismissal would be unreasonable and in violation of the due process of law. It was not so. Appellant retained his services or technical knowledge to the defendant. Even though it does not appear in the record, this retainer could have been made through fee or pay. It is said that appellant performed technical ballistics tests which could or could not have been realized during his working hours and using government equipment.

On one hand, one cannot say that the action of the Superintendent was entirely without basis or that it was entirely arbitrary. If the government experts in these materials would lease their services to the defendants or other persons, the moment might come when their testimonies would not be available to the People. On the other hand, one cannot say that the conduct of appellant was inherently of such an immoral or a detestable nature, that it deserved nothing but removal. According to him, his conduct had been tolerated or permitted by former Superintendents, and there did not exist rules which in a predetermined manner prohibited that practice.

In *Vitarelli* v. *Seaton*, 359 U.S. 535, a situation in a sense quite similar to ours was produced. An employee was suspended serving him with the written charges, that is, declaring the causes of dismissal. However, certain administrative proceedings which required hearing were not prosecuted. Under the applicable provisions, said employee could be dismissed from office without any motivation or causes. While

the case was pending, the appointing authority substituted in court the former dismissal notice, for another dismissing the employee. It was sustained that since the first method was chosen, the employee had the right to the established prosecution in such cases. The reinstatement of the employee was ordered, without prejudice to any subsequent action of the appointing authority in dismissing him.[4]

■ There is no doubt that if appellant is removed, he becomes ineligible for tests and for aspiration to a public service office. In view of the nature of his profession, it may be that there is no demand in private activity. The emphasis made by the Supreme Court, in the aforementioned *Cafeteria* v. *McElroy* case, should be noted, as to the fact that the governmental action did not deprive that employee of the opportunity of employment.

The fact that appellant becomes ineligible for any government office, or to aspire to it, is quite a serious and damaging fact, in comparison to his conduct.

■■ In the light of all the circumstances and considerations involved, the dismissal should be set aside and the matter remanded to the Superintendent so that he may, if he should deem it proper as appointing authority, terminate the services of the plaintiff without any charges and without consequences as to his eligibility for a public service office, and if he insists on a reasoned dismissal to give plaintiff the opportunity to be heard and defended.

This case shows once more, the necessity of a rule of the Personnel Board, which would cover this important field of governmental service, or of the study and recommendations to the pertinent authorities.

Judgment will be rendered accordingly, reversing the judgment appealed from.

---

[4] Mr. Justice Frankfurter said in concurring, 359 U.S. at p. 547: "He that takes the procedural sword shall perish with that sword."