CAMILO ARCELAY RIVERA, demandante y recurrente, *v.* SUPE-
RINTENDENTE DE LA POLICÍA DE PUERTO RICO, SALVADOR
RODRÍGUEZ APONTE, demandado y recurrido.

*Número:* R-66-277        *Resuelto:* 30 de junio de 1967

*S. L. Lagarde Garcés,* abogado del recurrente; *J. B. Fernández
Badillo, Procurador General,* y *J. F. Rodríguez Rivera, Sub-
procurador General,* abogados del recurrido.

Sala Segunda integrada por el Juez Asociado Señor Belaval como Presidente de Sala y los Jueces Asociados Señores Hernández Matos, Santana Becerra y Dávila.

EL JUEZ ASOCIADO SEÑOR SANTANA BECERRA emitió la opinión del Tribunal.

El Superintendente de la Policía destituyó al recurrente Camilo Arcelay Rivera en carta no fechada cuyo contenido se copia a continuación:

"Sr. Camilo Arcelay Rivera
Supervisor Técnicos de Identificación
P/C Decano Academia
Gurabo, Puerto Rico

Señor:

La Oficina del Inspector General ha realizado una investigación sobre la conducta observada por usted como empleado civil de esta Agencia.

Surge de esa investigación que el día 26 de abril de 1966 usted realizó pruebas técnicas sobre balística para ser usadas por los abogados de la defensa en un caso que llevaba el Estado Libre Asociado de Puerto Rico contra un ciudadano.

Demuestra también la investigación que durante los días 4, 5, 6 y 9 de mayo de 1966, usted compareció al Tribunal Superior de Mayagüez como perito de los abogados defensores del señor Enrique Carlo Aymat y allí discutió con los peritos del fiscal, que son funcionarios de la Policía, defendiendo los intereses del acusado y participó como tal perito en una estipulación que finalmente fue aprobada por las partes y se sometió a la consideración del tribunal y miembros del jurado. Además la investigación revela que usted no fue citado por el tribunal para testificar en este caso y que fue contratado por los abogados de la defensa para actuar como tal perito, para lo cual habría de recibir honorarios.

Se ha comprobado que al usted anteponer los intereses de un acusado a los intereses del Estado Libre Asociado de Puerto Rico, demuestra su incapacidad para continuar en el cargo que ocupa como Supervisor de Técnicos de Identificación en la Policía.

En vista de lo anterior no me queda otra alternativa que decretar su destitución del puesto que ocupa en la Policía efectiva al recibo de esta comunicación.

Atentamente,
[Fdo.] Salvador Rodríguez
SALVADOR RODRÍGUEZ
Superintendente"

El 31 de mayo de 1966 el recurrente contestó la anterior comunicación e hizo constar que en momento alguno había antepuesto los intereses de un acusado a los intereses del Estado Libre Asociado de Puerto Rico y tampoco había defendido intereses de acusados en particular, y sólo había servido en éste, como en todos los casos, a la verdad y a la justicia; que solicitó y obtuvo licencia de vacaciones para los días en que estuvo ausente, por lo que no había habido erogaciones por parte del Pueblo de Puerto Rico; que en el pasado y, a requerimiento de abogados defensores, había comparecido a juicios, entre otros, el que se siguió en el Tribunal Superior, Sala de Guayama, por el delito de Asesinato contra Jim Correa y el que se siguió en el Tribunal Superior de Aguadilla contra Rafael Dones Arroyo y Benigno Velázquez Lasalle, casos conocidos como contra la MAPA; que esos casos motivaron comunicaciones de reconocimiento a su labor, a pesar de comparecer como testigo de defensa, al entonces Superintendente Salvador T. Roig, casos que necesariamente se encontraban en los archivos, con fecha 30 de abril de 1965; que no fue hasta el 6 de mayo de 1966 en que el Pueblo de Puerto Rico pidió la comparecencia de peritos de la Policía y el 9, cuando éstos comparecieron, después de una conferencia con él y el Sr. León Lyon, se procedió a formular, redactar y suscribir una estipulación que lleva su firma, la de los otros peritos también de la Policía, la del Sr. Lyon y la de los Fiscales y abogados de la defensa; que sirvió a la verdad, sin ocultar nada ante autoridad alguna y

sus servicios a la verdad y a la justicia fueron confirmados y suscritos por los demás agentes, peritos de la Policía, culminando en la estipulación y sin que ninguno de los peritos tuviera que sentarse en la silla a testificar.

Pidió al Superintendente que reconsiderara su decisión ya que no había faltado a ninguna disposición reglamentaria o de ley. Solicitó también una vista donde él pudiera comparecer para una mejor clarificación de todos los hechos. El Superintendente confirmó la destitución por carta de 3 de junio de 1966 sin oir al recurrente.

La estipulación a que aludió el recurrente contestando su destitución y que fue considerada en el juicio criminal aludido, hace constar que después de conferenciar los peritos de El Pueblo, señores Carlos R. George y Jaime Rivera Quiñones y los peritos de la defensa, señores Camilo Arcelay y León Lyon, los Fiscales Luis H. Rivera Torres y José A. Andreu García y los abogados Amadeo Nazario Janer y S. L. Lagarde Garcés, estipularon:

"(a) Que a 37 pies de distancia de donde se hace el disparo a la tarjeta, apuntando a dicha tarjeta, el resultado de concentración de municiones sería del 90% de municiones en el cartucho y que estarían sumamente concentradas y juntas en el sitio donde se haga el blanco.

(b) Las heridas recibidas por el niño reflejan que el tiro fue hecho a una distancia mayor de 80 pies.

(c) Que a una distancia que fluctúa entre 80 pies y 150 pies sin apuntarle al niño, ha podido éste recibir las lesiones que recibió.

(d) Que a mayor distancia, mayor la dispersión.

(e) Que un cartucho calibre 12 #4 contiene 132 municiones.

(f) Que a más de 150 pies las municiones no tienen efectividad.

(g) Que de acuerdo con el sitio donde recibió las heridas el niño y la dispersión de las mismas, el disparo pudo haber sido hecho hacia arriba o hacia el lado del niño."

Lo anteriormente expuesto constituye el cuadro de hechos que sirve de fondo a este recurso.

El recurrente apeló ante la Comisión de la Policía, caso Núm. 346 y ésta, en 9 de junio de 1966 se declaró sin jurisdicción por no ser el recurrente un miembro de la Policía de Puerto Rico. (1)

Hay en el récord el acuerdo de la Junta de Personal Núm. 279, fechado 13 de junio de 1966, en donde se dictamina que "Surgiendo de la apelación presentada por el señor Arcelay Rivera, por conducto del Lic. S. L. Lagarde Garcés en 2 de junio de 1966, que el apelante es un empleado en el servicio sin oposición, se desestima la apelación por falta de jurisdicción."

En 19 de julio de 1966 el recurrente interpuso acción de *mandamus* en la Sala de San Juan del Tribunal Superior contra el Superintendente de la Policía, para que se ordenara restituirlo en su empleo permanente de Supervisor de Técnicos de Identificación, con los haberes dejados de percibir. En 19 de agosto de 1966 la Sala dictó sentencia declarando sin lugar la petición de *mandamus*, fundamentándose en *Rodríguez* v. *Buscaglia*, 63 D.P.R. 490 (1944). En el caso de *Rodríguez* hicimos nuestro el razonamiento de la Sala sentenciadora al efecto de que no estando aquel empleado demandante incluido en el Servicio Civil Clasificado, su cargo estaba a merced del allí demandado, sin que fuese menester para su separación la formulación de cargos, y sin que fueran

---

(1) La Ley de la Policía de Puerto Rico, Ley Núm. 77 de 22 de junio de 1956, dispone en su Art. 11 que crea la Comisión de la Policía que la Comisión actuará como cuerpo "apelativo" para oir y resolver todas aquellas apelaciones interpuestas por miembros de la Policía. Miembros de la Policía, según se define en el Art. 2 de dicha Ley, incluye únicamente al personal que directamente desempeña tareas encaminadas a mantener el orden público y proteger la vida y propiedades de los ciudadanos, y deberes similares. Dispone el Art. 6 que los miembros de la ·Policía estarán comprendidos dentro del Servicio Exento y el resto del personal estará comprendido dentro del Servicio sin Oposición bajo las disposiciones de la Ley de Personal.

No hay controversia en cuanto a que el recurrente no era un miembro de la policía, y que ejercía su empleo dentro del Servicio sin Oposición.

"pertinentes las motivaciones justas o injustas, de la separación."

Desde la decisión en 1944 del caso de *Rodríguez* v. *Buscaglia*, se han consagrado normas de política pública, ya legislativas, ya judiciales, respecto a los derechos del empleado en el servicio público gubernamental que por lo menos ameritan algún análisis, sin que meramente se despache la cuestión aquí litigiosa por la vía fácil de decir que no existe un derecho inherente o constitucional a disfrutar de un empleo público o que, según entendieron la Sala sentenciadora y la Junta de Personal, la destitución del recurrente no amerita consideración ulterior alguna por pertenecer él al Servicio sin Oposición.

—I—

En una evaluación global del servicio público a la luz de normas de servicio más avanzadas, la Ley de Personal de 1947 adoptó, en adición al Servicio Exento y al Servicio por Oposición—correspondientes al Servicio no Clasificado y al Clasificado, respectivamente, de las legislaciones anteriores —una tercera categoría de empleo o servicio, el Servicio sin Oposición. La Ley no ha definido este servicio, ni los otros dos, ni tampoco lo definen los reglamentos con fuerza de ley, pero el Legislador dispuso, y de tiempo en tiempo ha dispuesto, cuáles cargos o empleos están comprendidos en el Servicio sin Oposición—Sec. 8(b) de la Ley Núm. 345 de mayo 12 de 1947, y sus posteriores enmiendas.

En su gran mayoría este servicio se asemeja más al por Oposición que al Exento. Al igual que aquél, los empleados en el Servicio sin Oposición están comprendidos dentro del plan científico y uniforme de clasificación de la Sec. 10 de la Ley, y sujetos a la asignación y reasignación de puestos bajo dicho plan con la protección que ofrece la Sec. 11 que le sigue; están comprendidos dentro del plan uniforme de retribución que dispone la Sec. 13 con las ventajas del mismo

y sujetos a las escalas de retribución que se han dispuesto y se disponen por la Asamblea Legislativa; están cubiertos por el sistema de calificación por servicios basado en normas de *eficiencia*—Sec. 27—; tienen los mismos derechos respecto a licencias y a vacaciones, a licencia por enfermedad, licencias con o sin paga o especiales que el que tienen los del Servicio por Oposición—Sec. 28. Véanse la Sec. 29 (d) en cuanto a la acción contra la autoridad nominadora en la situación ahí prevista; el Art. 3 de la Ley Núm. 9 de marzo 7, 1951, exonerando a ambos servicios de ciertos impedimentos para ocupar otros puestos; el derecho de reinstalación del inciso (a), Art. 2 de la Ley Núm. 14 de 3 de mayo, 1963; la Sec. 34 que obliga a los funcionarios a rendir todos los informes que el Director requiera, referentes tanto a los empleados por oposición como a los sin oposición.

En lo que sin duda alguna son tres elementos esenciales del sistema de servicio gubernamental para un funcionamiento eficiente del mismo—el plan científico de clasificación de los cargos y empleos; el plan de retribución uniforme y equitativa según la naturaleza y la importancia de la función ejercida, y la calificación individual de méritos a base de eficiencia—la Ley ha equiparado al Servicio sin Oposición y al por Oposición. Originalmente no fue muy amplia la clase de cargos o empleos puestos en el Servicio sin Oposición, Sec. 8 (b) de la Ley. En virtud del mecanismo que proveyó la Sec. 8 (e), y por disposición de la Asamblea Legislativa en leyes separadas, este servicio ha adquirido hoy una mayor amplitud.

Tratando de explicarla, podría decirse que esta categoría intermedia recoge en ella la necesidad que tiene el gobierno de funcionar con cierta facilidad y soltura en determinadas posiciones o empleos y la necesidad, a la vez, de ofrecer la mayor protección y estabilidad posible al servidor público para una más eficiente labor, característica ésta del Servicio por Oposición. Así, las disposiciones de la Ley que en el

aspecto básico del sistema equiparan ambos servicios nos llevan a entender que ha podido ser el deseo Legislativo el que el empleado en el Servicio sin Oposición disfrute lo más posible de una relativa permanencia o de indefinida incumbencia, similar a la que ofrece el por Oposición, ya que a la larga en ello va envuelta la excelencia del trabajo rendido.

Reconocemos y aceptamos que se necesitan en el Servicio sin Oposición una cantidad deseable de cargos o empleos a merced sólo del poder nominador en cuanto a su incumbencia por razones de extrema confianza o porque ejerzan funciones normativas, de cuyos servicios el poder nominador pueda prescindir a su mejor criterio. En lo que se refiere a otras personas del Servicio sin Oposición que no están en la categoría antes referida, el Legislador al equiparar ambos servicios en los aspectos básicos y más importantes del sistema, parece haber indicado claramente que no concibió el Servicio sin Oposición como una incumbencia de día a día sin ninguna estabilidad, ya que de ser así, no podrían aplicarse muchas normas de la ley que cubren este servicio.

Dispone la Sec. 31 de la Ley que los funcionarios y empleados regulares en el Servicio por Oposición sólo podrán ser destituidos por justa causa y previa formulación de cargos. Luego se enumeran, entre otras, causas de destitución. Se dispone también el procedimiento a seguirse por la autoridad nominadora. De la destitución decretada por ésta, el empleado puede apelar a la Junta, y en definitiva, a la revisión del Tribunal Superior. En cuanto a destituciones o separación del empleado en el Servicio sin Oposición, la Ley no hace expresión alguna.

No obstante, la Sec. 6(a) concede poder a la Junta de Personal para *"investigar"* y resolver en apelación sobre las siguientes materias: destituciones, suspensiones, cesantías. . . . Además, la Ley ha concedido a la Junta un amplio poder tutelar sobre el sistema, más allá del mero poder adjudicador en los asuntos controvertidos. Puede asesorar al

Gobernador y al Director sobre problemas de personal, asesorar sobre el mejoramiento de las normas relativas al personal del Servicio; poder amplio de investigación en cuanto a la administración del personal y facultad de formular recomendaciones al Gobernador o al Director. Puede formular recomendaciones a la Asamblea Legislativa sobre la administración del personal y recomendaciones para el mejoramiento del sistema. Aun en los casos controvertidos en que actúa como organismo adjudicador, tiene facultad para investigar los hechos por sí misma, sin que esto prive a sus miembros de su facultad de decidir. La reglamentación que adopte en el ejercicio de esas amplias facultades tiene fuerza de ley una vez aprobada por el Gobernador y promulgadas, y tiene poder expreso para reglamentar todas las condiciones del trabajo para empleados en el Servicio por Oposición y en el sin Oposición.

El hecho de que la Ley silencie en lo referente a destituciones o separaciones en el Servicio sin Oposición no impide que la Junta conozca y reglamente un aspecto tan importante como éste para la estabilidad y eficiencia del sistema. Sin duda alguna puede ser objeto de su poder de investigación, y de asesoramiento al Gobernador, al Director o a la Asamblea Legislativa. Con mayor razón si se tiene en cuenta que la Sec. 15 de la Ley autoriza al Director a rechazar una solicitud de admisión a examen, o a eliminar su nombre de un registro, o a negarse a certificar su nombre, de una persona que ha sido despedida del servicio público; y que la Sec. 647–203 del Reglamento con fuerza de Ley dispone que podrá ser considerado como inelegible para nombramiento en el Servicio por Oposición y en el Servicio sin Oposición cualquier empleado destituido de su puesto en el Servicio Estatal. Véanse las disposiciones de la Ley Municipal haciendo inelegibles para cargos municipales a personas destituidas del servicio público.

Concebimos que en alguna forma la Junta pudo haber investigado este caso. Sin embargo, no estamos aquí revisando la negativa de la Junta a conocer de este asunto específico. Debemos, por lo tanto, enfrentarnos a la cuestión litigiosa dentro del procedimiento judicial de *mandamus* que fue escogido.

Sostiene el recurrente que su destitución sumaria viola el debido proceso de ley porque se le ha puesto un sello de deslealtad infamante y degradante y de incapacidad para el servicio público al imputársele en su destitución que antepuso los intereses de una persona particular a los intereses del Estado, y que ello es contrario también al dogma de que la dignidad del ser humano es inviolable consagrado en la Sec. 1ra. de la Carta de Derechos de la Constitución del Estado Libre Asociado, Art. II. Sostiene que aun cuando el servidor en el Servicio sin Oposición puede ser separado a voluntad del poder nominador, ello no debe llevar lesión a su dignidad e integridad sin oportunidad de defenderse.

Aunque ante un cuadro de hechos distinto, pero como expresión de norma general, se dijo en *Wieman* v. *Updegraff* por el Juez Clark, 344 U.S. 183, pág. 191: "Se nos refiere a nuestra expresión en *Adler* que las personas que buscan empleo en las escuelas públicas de Nueva York 'no tienen derecho a trabajar para el Estado en el sistema escolar fijando sus propias condiciones. [cita] Ellas pueden trabajar para el sistema escolar en las condiciones razonables expuestas por las autoridades apropiadas.' 342 U.S. 492. Extraer de este lenguaje la fácil generalización que no hay derecho constitucionalmente protegido a empleo público es opacar la controversia. . . . No es necesario que nos detengamos a considerar si existe en abstracto un derecho a empleo público. Es suficiente decir que la protección constitucional cubre a un servidor público cuya exclusión en razón de un estatuto es claramente arbitraria o discriminatoria."

Posteriormente, en *Slochower* v. *Board of Education*, 350 U.S. 551, el propio Juez Clark expone en norma general (pág. 555): "Decir que una persona no tiene un derecho constitucional a empleo en el gobierno es decir que él debe cumplir con aquellas condiciones *razonables, legales* y *no discriminatorias* impuestas por las autoridades apropiadas. . . . Pero en cada uno de estos casos se enfatizó que el Estado debe acoplarse a las exigencias del debido procedimiento. [sigue . referencia a lo expuesto en el caso de *Updegraff*, ante]."

A la pág. 559: "No ha habido la 'protección de estos individuos contra acción arbitraria' que el Juez Sr. Cardozo caracterizó como de. la esencia misma del debido procedimiento. [cita] Esto no quiere decir que Slochower tiene un derecho constitucional a ser un profesor asociado de Alemán en el Colegio de Brooklyn. El Estado tiene amplios poderes en la selección y despido de sus empleados y pudiera ser que una encuesta apropiada demostraría que la continuación de Slochower en el empleo fuera incompatible con un interés verdad del Estado. Pero aquí no ha habido tal encuesta. Sostenemos que la destitución sumaria del apelante viola el debido proceso de ley." [2]

*Cafeteria Workers* v. *McElroy*, 367 U.S. 886, ofrece vastas consideraciones sobre el problema. Se sostuvo la acción gubernamental que excluyó a una empleada de acceso a la cafetería donde trabajaba, negocio privado dentro de una

---

[2] Consúltense también: *Schware* v. *Board of Bar Examiners*, 353 U.S. 232, a la pág. 238: "Un Estado no puede excluir a una persona de la práctica del derecho, o de ninguna otra ocupación de una manera o por razones que contravengan la Cláusula del Debido Procedimiento o de la Igual Protección de la Enmienda Catorce. [citas]" (Nota pág. 239): "No tenemos que entrar a discutir si la práctica de la ley es un 'derecho' o un 'privilegio' . . . . Es suficiente decir que una persona no puede ser impedida de la práctica excepto por motivos válidos. Ciertamente la práctica del derecho no es materia de la gracia del Estado. [cita]" Y véase la concurrencia del Juez Frankfurter, 353 U.S. a la pág. 249; *Konigsberg* v. *State Bar*, 353 U.S. 252, pág. 262 y ss.

Factoría Naval que construía armas secretas, por razones de seguridad. No hubo notificación de cargos ni audiencia antes de privarla del acceso a su empleo. Se dijo, pág. 894:

"Queda la interrogante de si la acción del Almirante Tygree al denegarle sumariamente acceso a Rachel Brawner al lugar de su anterior empleo violó los requisitos de la Cláusula del Debido Procedimiento de la Enmienda Quinta. Esta pregunta no puede contestarse con la fácil aseveración que, porque ella no tenía un derecho constitucional a estar allí en primer lugar, ella no fue privada de su libertad o su propiedad por la acción del Superintendente. 'Uno puede no tener un derecho constitucional de ir a Bagdad, pero el Gobierno no le puede prohibir a uno que vaya allá a menos que sea por medios compatibles con el debido procedimiento de ley.' [citas] Alega la peticionaria que el debido procedimiento requería que Rachel Brawner fuera notificada de los motivos específicos de su exclusión y se le diera una audiencia en donde pudiera refutarlos. Estamos satisfechos, sin embargo, que bajo las circunstancias de este caso tal procedimiento constitucionalmente no se requería. . . ."

(Pág. 897)

"Nada de lo que dijimos o decidimos en *United Public Workers** o *Wieman*, llevaría a la conclusión de que a Rachel Brawner no se le podía negar acceso a la Factoría sin notificación y oportunidad de ser oída. Esos casos sólo demuestran que los gobiernos estatales y federal, aun en el ejercicio de sus funciones internas, no tienen constitucionalmente la completa libertad de acción que disfruta el patrono privado. Pero reconocer que existen restricciones constitucionales sobre los gobiernos estatales y federal en el trato de sus empleados no es decir que todos dichos empleados tienen un derecho constitucional a notificación y audiencia antes de ser separados. Podemos asumir que Rachel Brawner no podía constitucionalmente ser excluida de la Factoría si los motivos anunciados para su exclusión hubieran sido claramente arbitrarios o discriminatorios . . . . No se deduce, sin embargo, que ella tenía derecho a notificación y audiencia cuando el motivo anticipado para su

(*) *United Public Workers* v. *Mitchell*, 330 U.S. 75.

exclusión era, como aquí, enteramente razonable y de acuerdo con el contrato con M. & M.

Finalmente, debe apercibirse que éste no es un caso en que la acción del gobierno ha implicado el poner un sello de deslealtad o infamante, con la consiguiente privación de otras oportunidades de empleo. [citas] Todo lo que señala el récord es que en opinión del funcionario de seguridad de la Factoría, en la que concurrió el Superintendente, Rachel Brawner no llenaba los particulares requisitos de seguridad de esta instalación militar específica. Nada hay que indique que esta determinación en alguna forma menoscabaría las oportunidades de empleo de Rachel Brawner en algún otro sitio . . . . Por todo lo que aparece, el Oficial de Seguridad y el Superintendente sencillamente han podido creer que Rachel Brawner era locuaz o descuidada con su insignia de identificación." (3)

██ Contra este fondo doctrinal, examinamos la cuestión aquí planteada. Es claro que el hecho de que el estatuto de Personal no provee la separación del Servicio sin Oposición previa notificación de causa y oportunidad de ser oído, como lo hace con el Servicio por Oposición, ni que tampoco los reglamentos de la Junta así lo dispongan, no convierte la destitución del recurrente, por ese sólo hecho, en una al margen del debido proceso de ley. El sistema es constitucional. Sería también un poco exagerado sostener que el recurrente quedó tachado con un sello infamante sobre su persona y mancillado en su dignidad y hombría y como ciudadano, por la expresión de la carta de destitución de que había antepuesto los intereses privados a los del gobierno, tomado ello a la luz de los hechos que dieron lugar a la destitución. Ésta ' era más bien una conclusión del Superintendente inferida de esos hechos.

En cuanto a lo razonable, debe ser claro que si al recurrente se le hubiera destituido por cumplir con la citación de un Tribunal, aun cuando su intervención fuera en favor

---

(3) Cf. *Nelson* v. *Los Angeles County*, 362 U.S. 1; *Peters* v. *Hobby*, 349 U.S. 331; *Adler* v. *Board of Education*, 342 U.S. 485; *Garner* v. *Board of Public Works*, 341 U.S. 716.

del acusado y contra el Pueblo, ya habríamos decretado que su destitución sería irrazonable y en violación del debido proceso de ley. No fue así. El recurrente arrendó sus servicios o conocimientos técnicos al acusado. Aun cuando no surge del récord, ese arrendamiento de servicios pudo ser mediante estipendio o paga. Se dice que el recurrente realizó pruebas técnicas sobre balística, que han podido ser o no usando tiempo de su trabajo y equipo del gobierno.

De una parte, no puede decirse que la acción del Superintendente estuviera totalmente carente de base o fuera totalmente arbitraria. Si los técnicos del gobierno en estas materias o en otras arrendaran sus servicios a los acusados o a otras personas, podría llegar el momento en que sus testimonios no estarían disponible para el Pueblo. Por otra parte, tampoco puede decirse que la conducta del recurrente era inherentemente de tal naturaleza inmoral o detestable, que no ameritara sino la destitución. Según él, su actuación había sido tolerada o permitida por Superintendentes anteriores, y tampoco existían reglas que en forma predeterminada prohibieran esa práctica.

En *Vitarelli* v. *Seaton*, 359 U.S. 535, en un sentido se produjo una situación bastante parecida a la nuestra. Se destituyó a un empleado imputándole hechos, o sea, exponiendo los motivos de la destitución. Sin embargo, no se siguieron ciertos procedimientos administrativos que requerían audiencia. Bajo las disposiciones aplicables, dicho empleado podía ser separado del empleo sin motivación o causa alguna. Pendientes los procedimientos la autoridad nominadora sustituyó en corte la orden de destitución anterior por otra separando al empleado. Se sostuvo que habiendo elegido el primer método aquel empleado tenía derecho a que se le siguieran los procedimientos fijados para tales casos. Se ordenó la reinstalación del empleado, sin menoscabo de cual-

quier acción posterior de la autoridad nominadora para separarlo. (⁴)

■ No hay duda que destituido el recurrente, queda inelegible para tomar examen y aspirar a empleo en el servicio público. Considerada la naturaleza de su profesión quizás no tenga demanda en la actividad privada. Es de notar el énfasis dado por el Tribunal Supremo en el caso de *Cafetería v. McElroy*, ante, al hecho de que la acción gubernamental no privaba a aquella empleada de oportunidades de empleo.

El que el recurrente quede inelegible para cargo alguno en el gobierno, o para aspirarlo, es un hecho bastante serio y perjudicial, en comparación a su conducta.

■ A la luz de todas las circunstancias y consideraciones envueltas, debe resolverse que se deje sin efecto la destitución recaída y se devuelva el asunto al Superintendente para que si ese fuere su criterio como poder nominador, termine los servicios del querellante sin imputación alguna y sin consecuencia en cuanto a su elegibilidad para empleo en el Servicio Público; y de insistir en una destitución fundamentada dé ante él al querellante la oportunidad de ser oído y defenderse.

Este caso demuestra una vez más, la necesidad de una reglamentación de la Junta de Personal cubriendo esta esfera importante del servicio gubernamental, o de estudio y recomendaciones a las autoridades pertinentes.

*Se dictará sentencia de conformidad, revocando la recurrida.*

---

(⁴) Concurriendo, dijo el Juez Frankfurter, 359 U.S. pág. 547:
"He that takes the procedural sword shall perish with that sword."