**Robert D. HAMM, Plaintiff,**

v.

**Rex H. SCOTT, Individually and as Chief Judge of the 20th Judicial District of the State of Colorado, et al., Defendants.**

**Civ. A. No. 76 M 910.**

United States District Court,
D. Colorado.

Jan. 25, 1977.

James R. Gilsdorf, Denver, Colo., and Robert F. Moreland, Boulder, Colo., for plaintiff.

Janice L. Burnett, First Asst. Atty. Gen., Litigation Section, Denver, Colo., Thomas V. Holland, Spec. Asst. Atty. Gen., Human Resources Section, and David R. Brougham, Yegge, Hall & Evans, Denver, Colo., for defendants.

## FINDINGS, CONCLUSIONS AND ORDER

MATSCH, District Judge.

Robert D. Hamm seeks relief under the limited jurisdiction granted by 28 U.S.C. § 1343(3) and (4) and 42 U.S.C. § 1983 upon the claim that the termination of his employment as chief juvenile probation officer for the 20th Judicial District of the State of Colorado was a deprivation of his property without due process of law, in violation of the protection given by the Fourteenth Amendment to the Constitution of the United States. The evidence taken at a hearing on the plaintiff's motion for preliminary injunction established the facts upon which the claim is based.

After service as a student volunteer, Robert D. Hamm was appointed as a probation officer for the 20th Judicial District in October, 1967, and four years later he was named the chief juvenile probation officer for that court. During the time of his employment, Mr. Hamm was working under the direction and supervision of Judge Horace Holmes, the district judge assigned to juvenile matters. The official duties of a chief probation officer as set out in the applicable job description include the following:

> Maintains cooperative relationship with state and local welfare and social service agencies, institutions, and law enforcement agencies, and relates the activities of the department to their services; participates in coordinating of the department to their services; participates in

coordinating councils, committees, and other groups interested in probation or crime prevention.

The Honorable Rex H. Scott became a judge of the 20th Judicial District on July 1, 1970, and he was named chief judge of that district in January, 1975. On May 4, 1976, Judge Scott was in possession of copies of correspondence and memoranda concerning the conduct of Mr. Hamm in his official capacity and his relationship with several social service agencies. This correspondence included an exchange of letters with a high school principal in March, 1976. Judge Scott took copies of these documents to Judge Holmes on the morning of May 4, 1976 with a request that Judge Holmes obtain Mr. Hamm's resignation or terminate his employment. Judge Holmes declined to take that action, and Judge Scott then asked Judge Holmes to give the copies to the plaintiff.

When he was informed that Judge Scott wanted a resignation or termination of employment, Mr. Hamm asked to see Judge Scott and, at about 11:30 A.M., they met in Judge Scott's chambers. At that meeting, Mr. Hamm denied the accusations in the letters. Judge Scott told the plaintiff that he should submit his resignation or be discharged by 4 P.M. that day. Mr. Hamm asked for more time, and he asked for an opportunity to bring in agency directors and other persons to make statements on his behalf. Judge Scott adhered to the 4 P.M. deadline. Mr. Hamm did return to Judge Scott's chambers at 4 P.M. on that same day and submitted a handwritten statement which generally denied all accusations and in which Mr. Hamm refused resignation. After reading that document, Judge Scott told Mr. Hamm that he was dismissed, and a letter of termination, signed by Judge Scott, was given to the plaintiff. In that letter, Judge Scott set forth the following reasons for termination.

1. Failure to comply with a reasonable and proper assignment from an authorized supervisor.

2. Documented inefficiency, incompetency, in the performance of duties, i.e.

that you have been a negative and alienating force with the youth serving agencies.

3. Conduct unbecoming a state judicial department employee.

Article VI, Section 5(2) of the Colorado Constitution provides that the chief justice is the "executive head" of the judicial system of that state. Section 5(4) of the same article provides that the chief judge of each district shall be appointed by and serve at the pleasure of the chief justice and that each chief judge shall have such administrative powers as shall be delegated to him by the chief justice. On August 27, 1971, Chief Justice Edward E. Pringle executed a written delegation of authority to all chief judges. That delegation was a very broad grant of administrative power, including the authority to appoint and remove personnel, excepting confidential employees of a judge.

The terms and conditions of employment of the employees of the executive branch of Colorado's government are established by a merit personnel system under Article XII, Section 13 of the state's constitution. Those provisions do not apply to those who work in the judicial department. Subparagraph (3) of Section 13 provides:

(3) Officers and employees within the judicial department, other than judges and justices, may be included within the personnel system of the state upon determination by the supreme court, sitting en banc, that such would be in the best interests of the state.

The Colorado General Assembly has, by statute, provided for the establishment of a personnel classification and compensation plan for all courts pursuant to rules adopted by the Supreme Court of Colorado. 1973 C.R.S. § 13–3–105. Subsection (4) of that section reads as follows:

(4) To the end that all state employees are treated generally in a similar manner, the supreme court, in promulgating rules as set forth in this section, shall take into consideration the compensation and classification plans, vacation and sick leave provisions, and other conditions of employment applicable to employees of the executive and legislative departments.

The Colorado Supreme Court did adopt personnel rules in 1970. Under those rules, there was no right of review of any personnel decision affecting supervisory positions. The plaintiff here was placed in a supervisory position in 1971.

The rules were rewritten and readopted by the Supreme Court with an effective date of January 1, 1975, and designated Colorado Judicial System Personnel Rules (CJSPR). The plaintiff here was a "certified employee" under those rules, and under Rule 26(a) such an employee may be dismissed for any of the reasons enumerated in Rule 25(d). That rule enumerates grounds which include those set forth in the termination letter issued by Chief Judge Scott.

Rule 45 establishes a Board of Review having jurisdiction over requests for review of discharges and other personnel actions. Rule 46 describes the right of review given to certified employees, and subsection (b)(2) expressly excludes a number of positions from that right of review. Chief probation officers are among those excluded positions.

Mr. Hamm sought to obtain a hearing before the Board of Review. A review board hearing was denied with the approval of Chief Justice Pringle upon the basis of the exclusion in Rule 46.

Mr. Hamm had no written contract of employment and there is nothing in evidence to support a finding of any express oral agreement or promise of any term or tenure.

I.

The plaintiff's principal contention here is that the personnel rules created an objective expectation of tenure which should be characterized as a property interest subject to due process protection on the authority of *Board of Regents v. Roth,* 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972); *Perry v. Sindermann,* 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972); and *Arnett v. Kennedy,* 416 U.S. 134, 94 S.Ct. 1633, 40 L.Ed.2d 15 (1974).

In *Roth*, an assistant professor of political science at a public university had been hired for a one-year fixed term of employment pursuant to a written contract. He had no tenure and there were no statutory or administrative standards of eligibility for reemployment. After he had been openly critical of the school administration, the teacher was notified that he would not be employed for the following academic year. He sued, alleging that he had been punished for his criticism in denial of his First Amendment freedom, and he asserted a right to procedural due process. The district court ordered a partial summary judgment for the plaintiff on the claim of entitlement to procedural due process, which, the court held, required a statement of reasons for non-hiring and an opportunity for a hearing on those reasons. *Roth v. Board of Regents*, 310 F.Supp. 972 (W.D.Wis.1970). That result was affirmed in *Roth v. Board of Regents*, 446 F.2d 806 (7th Cir. 1971).

A majority of the Supreme Court reversed the order on summary judgment, observing that the only question presented was whether the teacher had a constitutional right to a statement of reasons and a hearing on the decision not to rehire him for another year. In holding that he did not, Justice Stewart concluded that a determination of the nature or character of the teacher's interest was controlling of whether it came within the Fourteenth Amendment's protection of liberty and property. Because the district court had stayed any development of the issues on the claim of retaliation for the exercise of freedom of speech, that allegation was not before the Supreme Court. The Supreme Court's holding in *Roth* was that a teacher who had not been rehired for one year at one public university had no protectable interest in reemployment without proof of something more.

The *Sindermann* case came to the Supreme Court differently. There, the district court granted a summary judgment for the defendants, regents of a public junior college, who had failed to renew the plaintiff's one-year employment contract, and who had issued a press release containing allegations of insubordination on which there had been no hearing or factual determination.

The teacher had been employed with the same institution for four successive years under a series of one-year contracts, and he had taught an additional six years at other schools within the state college system. He had been involved in public disagreements with the defendant regents. Without taking evidence, the trial judge dismissed the plaintiff's claim that the failure to renew his contract was a retaliation for his public criticism and the claim that the failure to provide him with a statement of reasons and an opportunity to challenge those reasons resulted in a denial of procedural due process.

The Fifth Circuit had reversed this ruling, *Sindermann v. Perry*, 430 F.2d 939 (5th Cir. 1970), for the obvious reason that the plaintiff had not been given an opportunity to develop evidence of his contentions that the defendants withheld renewal of his contract on the impermissible basis of reprisal for the exercise of rights protected by the First Amendment. Having decided to remand, the Fifth Circuit apparently felt obliged to offer direction to the district court with regard to plaintiff's claim of entitlement to a hearing. In considering what academic procedures should be made available, the court said that a determination had to be made as to whether the teacher had "an expectancy of reemployment under the policies and practices of the institution." 430 F.2d at 943.

Whether such an expectancy existed would determine whether a pretermination hearing was necessary (with the regents having the burden of establishing cause) because the requirement of cause as a condition to a failure to renew was a part of the contractual expectancy of reemployment. However, if no such expectancy were established by the evidence, the teacher would have the burden of showing that the decision was wrongful and the administrative hearing should be so conducted by

the academic authorities. In making that distinction, the court said at page 944:

On the other hand, if the court resolves that Sindermann did not have an expectancy of reemployment which would require the college to show cause for the decision not to renew his contract, a different procedure would be indicated. In such a situation, upon receipt of notice that a new contract will not be offered, the teacher must bear the burden both of initiating the proceedings and of proving that a wrong has been done by the collegiate action in not rehiring him. It is incumbent upon such a teacher, not the college, to shoulder these responsibilities because the college may base its decision not to reemploy a teacher without tenure or a contractual expectancy of reemployment upon any reason or upon no reason at all.

A majority of the Supreme Court affirmed the circuit. The first question considered was whether the

. . . lack of a contractual or tenure right to re-employment, taken alone, defeats his claim that the nonrenewal of his contract violated the First and Fourteenth Amendments. (408 U.S. 593, 596, 92 S.Ct. 2694, 2697, 33 L.Ed.2d 570)

In holding that the claim was not so disqualified, the Supreme Court applied the well-developed principle that government may not act on any basis which infringes a constitutionally protected individual interest, particularly freedom of speech and association. Accordingly, any claim of contract right was considered to be irrelevant to the freedom of speech claim, and the teacher should have been given the right to develop the factual basis for his claim of infringement.

The Court then considered the separate claim of entitlement to some kind of hearing as a part of the non-renewal decision. It was noted that the teacher had not been given an opportunity to introduce evidence to establish the existence of an interest which would warrant due process protection. The holding was that the allegations of the complaint were sufficient to state a claim of a protectable interest. The majority said at pages 600–601, 92 S.Ct. at page 2699:

In particular, the respondent alleged that the college had a *de facto* tenure program, and that he had tenure under that program. He claimed that he and others legitimately relied upon an unusual provision that had been in the college's official Faculty Guide for many years:

"*Teacher Tenure*: Odessa College has no tenure system. The Administration of the College wishes the faculty member to feel that he has permanent tenure as long as his teaching services are satisfactory and as long as he displays a cooperative attitude toward his coworkers and his superiors, and as long as he is happy in his work."

Moreover, the respondent claimed legitimate reliance upon guidelines promulgated by the Coordinating Board of the Texas College and University System that provided that a person, like himself, who had been employed as a teacher in the state college and university system for seven years or more has some form of job tenure. [footnote omitted] Thus, the respondent offered to prove that a teacher with his long period of service at this particular State College had no less a "property" interest in continued employment than a formally tenured teacher at other colleges, and had no less a procedural due process right to a statement of reasons and a hearing before college officials upon their decision not to retain him.

The Court then referred to the concept of implied contract, citing 3 A. Corbin on Contracts §§ 561–572A (1960), and paraphrased the doctrine of promissory estoppel. Finally, Mr. Justice Stewart wrote:

We disagree with the Court of Appeals insofar as it held that a mere subjective "expectancy" is protected by procedural due process, but we agree that the respondent must be given an opportunity to prove the legitimacy of his claim of such entitlement in light of "the policies and practices of the institution." 430 F.2d at

943. Proof of such a property interest would not, of course, entitle him to reinstatement. But such proof would obligate college officials to grant a hearing at his request, where he could be informed of the grounds for his nonretention and challenge their sufficiency. (408 U.S. 593, 603, 92 S.Ct. 2694, 2700, 33 L.Ed.2d 570)

I most respectfully suggest that much of the apparent confusion and difficulty experienced in the trial and appellate courts since *Roth* and *Sindermann* result from a failure to stay within traditional definitions of property interests. Contrary to Mr. Justice Stewart's suggestion, the Fifth Circuit did not indicate any view that a mere subjective expectancy of reemployment entitles one to procedural due process protection. The "contractual expectancy" language in the Fifth Circuit opinion is nothing more than an abbreviated statement of the well-recognized law of implied contract and promissory estoppel. The pretermination hearing with the burden on the college to establish cause was not considered to be a requirement of procedural due process; it was simply one of the terms and conditions of the implied employment contract. As the circuit court noted, if no such contract existed, then the protection of academic freedom required some other form of procedural due process hearing before termination became final.

In *Bishop v. Wood*, 426 U.S. 341, 96 S.Ct. 2074, 48 L.Ed.2d 684 (1976), a majority of the Supreme Court affirmed a summary judgment dismissing the due process claims of a police officer who had been a permanent employee of Marion, North Carolina. The city manager terminated the plaintiff's employment without a hearing to determine any cause for discharge, despite a city ordinance which appeared to require cause. Writing for the majority, Mr. Justice Stevens observed that property interests are created and defined by state law and that

the trial court's decision that the ordinance did not create a property interest such as to require constitutional protection was not subject to independent examination by the Supreme Court.[1]

Three Justices agreed with the dissent by Mr. Justice White, who viewed the denial of the existence of a property interest as inconsistent with the views of a majority of the Court in *Arnett v. Kennedy*, 416 U.S. 134, 94 S.Ct. 1633, 40 L.Ed.2d 15 (1974). In that case, a federal civil service employee was removed from his job as a field representative in a regional office of the Office of Economic Opportunity, pursuant to the procedures established by federal statute and regulations. Written administrative charges were made and upheld by the OEO regional director. The employee failed to avail himself of the right to reply to these charges, and he failed to appeal to the Civil Service Commission. He then sued, contending that the statutory standards and procedures were not sufficient protection of his interest to be considered due process of law and that there was an unwarranted interference with freedom of expression.

Mr. Justice Rehnquist, writing for three Justices, found that the statutory procedures for termination and post-termination review were limitations on any property right conferred by the civil service statutes. He stated succinctly at page 155, 94 S.Ct. at page 1645:

Here the property interest which appellee had in his employment was itself conditioned by the procedural limitations which had accompanied the grant of that interest.

The administrative appeal and review procedures were held to be a sufficient protection of the First Amendment right.

Mr. Justice Powell, joined by Mr. Justice Blackmun, concurred in the result but used different reasoning. The disagreement derived from Mr. Justice Powell's perception

---

1. The only indication of any infringement of a liberty interest was the possible stigmatic effect of the firing. Because the reasons for the discharge had not been communicated to the public, there could be no impact on the plaintiff's reputation and, accordingly, no deprivation of any recognizable liberty interest.

of the earlier opinions in *Roth* and *Sindermann* as holding that whenever a property interest is found to exist, it is constitutionally protected by the due process clause. He then proceeded to determine what procedure would be adequate for due process by balancing the government's interest in expeditious removal of an unsatisfactory employee against the interests of the employee in continued employment. The conclusion reached by these two Justices was that the procedure established by the federal act and regulations was sufficient to meet the constitutional requirements. Mr. Justice White's concurring and dissenting opinion used the same balancing process with different weights, concluding that due process required a pretermination hearing by an impartial decision-maker, but that the trial type of hearing could be reserved for review.

Read together, these cases offer only the broadest and most generalized guidance for the trial courts in resolving the kind of dispute presented here. The difficulty is compounded because prior to *Roth* and *Sindermann* we could presume that employment would not differ from any other form of contract-created property interest; consequently, it could be adequately protected, upon breach or repudiation, by a common law action in damages or by appropriate equitable relief. Does the fact that one of the contracting parties is a governmental entity alter the property characteristics of the agreement? It does so only in the sense that it involves state action, to which the prohibitions of the Fourteenth Amendment apply. Yet, there is nothing to suggest that all state contracts come within the protection of the due process clause. We have not yet seen any case holding that a road builder or supplier of materials must receive notice, a statement of reasons and an opportunity to be heard before the state refuses payment. Absent a statute or specific contractual provision, those parties are, presumably, still required to pursue their remedy in court after a breach has occurred.

Additional confusion results from a recognition of the mutability of the due process doctrine. The Supreme Court has found adequate protection in a great range of procedures, varying them according to the vitality and perceived importance of the interest being protected. For example, where a loss of welfare benefits is threatened, minimal due process has been held to require a pretermination hearing, replete with notice and an opportunity to present oral argument, to obtain counsel, and to confront and cross-examine adverse witnesses. *Goldberg v. Kelly*, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970). The profound deprivation of liberty occasioned by parole revocation is similarly viewed as requiring relatively stringent procedures for due process to be satisfied. The parolee must be afforded the opportunity to present witnesses and documentary evidence before a 'neutral and detached' hearing body, and is entitled to a written statement of facts relied upon in the event parole is revoked. *Morrissey v. Brewer*, 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972). Most recently, the Court has determined that public school students may not suffer temporary, short-term suspensions absent procedural due process. *Goss v. Lopez*, 419 U.S. 565, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975). In this context, however, the due process clause is satisfied if the student is given "an opportunity to explain his version of the facts" at an informal meeting with the disciplinarian, after having been told of the basis for the accusation. 419 U.S. at 582, 95 S.Ct. at 740.[2]

Are all public employment contracts to be given some form of pretermination protection by the due process clause? The Supreme Court has not answered that question. It seems significant that *Roth* and *Sindermann* involved the employment of teachers. The courts have long been concerned with attempts to articulate academic freedom. The many cases which have arisen on the subject of teacher conduct, curriculum control, retaliation for speech or con-

---

**2.** For a comprehensive discussion of this variable nature of due process protection, see Friendly, *"Some Kind of Hearing"*, 123 U.Pa.L. Rev. 1267 (1975).

duct and parental objections to assignments all reveal the enormous difficulty in the balancing of interests involved in public education. I suggest that this same difficulty has been present in the teacher employment cases and that the concern for procedural protections for such employment is more a reflection of the vital interests in affording fairness and freedom in the public classroom than an elevation of claims of injury to contract and property interests to matters of constitutional moment. As Mr. Justice Douglas fully recognized in *Roth*, "In the case of teachers whose contracts are not renewed, tenure is not the critical issue." 408 U.S. at 582, 92 S.Ct. at 2712 (dissenting opinion). Rather, as one might expect, the vast number of teacher employment cases prior to *Roth* and *Sindermann* presented the critical issue as one of academic freedom or First Amendment rights, not one of Fourteenth Amendment protection afforded a property interest in continued employment. See, for example, *Keyishian v. Board of Regents*, 385 U.S. 589, 87 S.Ct. 675, 17 L.Ed.2d 629 (1967); *Shelton v. Tucker*, 364 U.S. 479, 81 S.Ct. 247, 5 L.Ed.2d 231 (1960); and *Wieman v. Updegraff*, 344 U.S. 183, 73 S.Ct. 215, 97 L.Ed. 216 (1952). While the claims of academic freedom or infringement of First Amendment rights were not directly before the Supreme Court in *Roth* or *Sindermann*, such claims were within the pleadings.

In the many opinions coming from the federal courts citing *Roth* and *Sindermann*, there are frequent discussions of the expanding notion of property interests, and it has become commonplace to refer to *Goldberg v. Kelly*, for example, as evidencing such expansion. The failure to distinguish among interests with differing values causes a failure to bring the issues into an appropriate focus. *Goldberg v. Kelly* was based on the perception that an unfair termination of welfare benefits would create a condition of brutal need. While a casual reference to the possibility of regarding such entitlement as property was mentioned in a footnote, the distinguishing characteristics and the recognition of the importance of pretermination protection were clearly stated in the following language:

Thus the crucial factor in this context—a factor not present in the case of the blacklisted government contractor, *the discharged government employee*, the taxpayer denied a tax exemption, or virtually anyone else whose governmental entitlements are ended—is that termination of aid pending resolution of a controversy over eligibility may deprive an *eligible* recipient of the very means by which to live while he waits. Since he lacks independent resources, his situation becomes immediately desperate. His need to concentrate upon finding the means for daily subsistence, in turn, adversely affects his ability to seek redress from the welfare bureaucracy. [footnote omitted] (397 U.S. 254, 264, 90 S.Ct. 1011, 1018, 25 L.Ed.2d 287) [first emphasis added]

I have no quarrel with the holding and reasoning in *Goldberg v. Kelly*. It reflects a profound concern for protecting the interests of the individual against wrongful or arbitrary action in the ever-increasing areas of impact by governmental authority. That concern is the root philosophy of the constitution. Repudiation of the right-privilege dichotomy is but a recognition that there is a growing dependency upon governmental programs to provide an ability to cope with the conditions of modern living, and a corresponding increase in the danger of destruction of vital individual interests by those in authority acting without fundamental fairness. I had no difficulty in following *Goldberg v. Kelly* in reaching my decision in *Ryan v. Shea*, 394 F.Supp. 894 (D.Colo.1974), aff'd. 525 F.2d 268 (10th Cir. 1975).

But to reach these results it is not necessary to distort the principles of property law. It is not necessary to clothe teachers with court-created concepts of property to protect them from governmental actions which interfere with the freedom to practice the teaching profession in a manner which affects the public interest. It would be enough simply to recognize that issues

involved in the employment of public school teachers are but a part of the larger area of special concern for public education and its particularized problems of balancing state, public and private interests. That area has long involved the courts and the constitution.[3]

The Tenth Circuit Court of Appeals has recognized that the Supreme Court has differentiated among types of property interests in its concern for constitutional protection. In *Abeyta v. Town of Taos*, 499 F.2d 323 (10th Cir. 1974), the circuit court, speaking through Judge Hill, said at page 327:

> The types of property protected by the due process clause vary widely and what may be required by that clause in dealing with one set of interests may not be required in dealing with another set of interests.

In that case, the appellate court affirmed the trial judge's findings and conclusions that police officers in Taos, New Mexico had no contract and that their employment was terminable at will. Accordingly, there was no property interest subject to protection.

*Bertot v. School District No. 1, Albany County, Wyo.*, 522 F.2d 1171 (10th Cir. 1975) involved the failure to renew the annual contracts of teachers without tenure. The plaintiffs sought relief under *Sindermann* by claiming an objective expectancy of continued employment because, in the hiring interviews, the school principal was interested in the plaintiffs' intention to become permanent residents of the area; the school board had never failed to reemploy a teacher since 1966; and the expressed hiring philosophy of the school district was the renewal of probationary teachers whose performance was satisfactory. Again, the circuit court affirmed the trial judge's finding and conclusion that these facts did not establish a property interest subject to protection by the Fourteenth Amendment. Judge Holloway analyzed the case in tradi-

tional contract terms. He said at page 1176 of the opinion:

> Agreements may be implied though not formalized, and explicit contractual provisions may be supplemented by other agreements implied from a promisor's words and conduct in the light of the surrounding circumstances.

Again at page 1177 of the opinion:

> Moreover the defendants' conduct and the statements made to the plaintiffs cannot be equated to promissory representations or to words, conduct and usage importing an agreement.

A similar analysis was made in another teacher case, *Weathers v. West Yuma County School District*, 530 F.2d 1335 (10th Cir. 1976).

In *Mitchell v. King*, 537 F.2d 385 (10th Cir. 1976), the Governor of New Mexico removed the plaintiff as Regent of the Museum of New Mexico without notice or hearing. The New Mexico Constitution gave the governor appointing authority over that position. The court of appeals affirmed the district court's dismissal for failure to state a claim for relief upon the conclusion that there was no protectable property interest. In arriving at that result, Judge Barrett emphasized the state constitutional power given to the governor and the importance of absolute authority to remove policy-making officials when their conduct and acts in office are not in harmony with the views and wishes of an official who is accountable to the people.

These Tenth Circuit cases are helpful clarification of the language used by the various Supreme Court Justices who have written opinions on the subject of public employment. Thus, it seems now to be clear that the notion of "expectancy" or "objective expectancy" is not a new doctrine in the law of property. It is nothing more than a paraphrase of the traditional principles of implied contract and promissory estoppel. Consequently, if, under the law of a particular state, implied contracts

---

**3.** For a broad overview of education law, see *Education and the Law: State Interests and Individual Rights*, 74 Mich.L.Rev. 1373 (1976).

are not enforceable or promissory estoppel is not recognized or state law holds that such a doctrine as applied to particular types of public employment would be against public policy, then it would follow that no property right can be given constitutional protection for such public employees of that state.

■ Under the learning of the cases which I have discussed herein, a proper analysis of the facts involved in the Fourteenth Amendment property claims of state employees requires that four questions be answered:

1. *Is there a recognizable contractual or other property interest under state law?* Recognizing that new concepts of property interests have and will continue to emerge through legislation and common law development, it is important to be able to identify the existence of such an interest by a definition available from some source other than a broad claim of a need for protection. Thus, the property interest must be subject to recognition in the law of the state. Such property interests include express contracts, contracts implied in fact, contracts implied in law (promissory estoppel), statutory grants and licenses.

2. *Is the enforcement of the claimed contractual or other property interest contrary to the expressed public policy of that state?* It is familiar learning that courts will not enforce contracts which are illegal because they are in violation of criminal or regulatory laws or because they contravene established public policy. 6 A. Corbin on Contracts, Part VIII (1962). Likewise, the ownership or possession of narcotics, illegal weapons and many kinds of contraband are recognized limitations on property rights.

3. *Is the recognized enforceable property interest worthy of the protection of procedural due process under the Fourteenth Amendment?* Stated differently, does the affected property interest contain some extra dimension which would warrant the additional protection of procedural due process? If not, the status of the employment property interest would be comparable to that of a commercial contract with the state, and the aggrieved party must resort to a common law remedy for its preservation. The perhaps singular nature of teacher employment—imbued with the precious and precarious notion of academic freedom—provides such an extra dimension deserving of procedural due process safeguards. It would be inappropriate at this time to speculate on what other positions of employment might qualify under this standard.

4. *How much protection is required?* Due process is an elastic concept; the amount of process due in any given situation varies according to the perceived weight of the interest involved and the context in which it arises. Determination of procedural requirements for the protection of a proper interest in public employment calls for a balancing of the individual's interest with the public interest.

## II.

In determining the subject case, each of these four questions · will be considered, even though the answer to any one of them may make further inquiry superfluous.

■ 1. Is there a recognizable contractual or other property interest under state law?

Robert Hamm has presented no evidence which would suggest, let alone support, a finding of an express or implied contract. There is nothing to indicate any agreement or meeting of the minds on any term of employment as chief probation officer. There is nothing to show that in accepting appointment as chief probation officer he was relying upon any promise of any term or condition. Rather, the facts compel a finding that Mr. Hamm was aware that he was serving at the pleasure of the chief judge of the district court.

The plaintiff's primary contention is that he has a protectable property interest because Rules 25 and 26 of CJSPR prescribe reasons for which permanent employees of the judicial department may be discharged, and that is said to be analogous to the position of the federal civil service employ-

ee plaintiff in *Arnett v. Kennedy, supra.* The cases are not comparable. 5 U.S.C. § 7501(a) clearly provides that "[a]n individual in the competitive service may be removed or suspended without pay only for such cause as will promote the efficiency of the service." Congress then provided the procedures for discharge determinations. In four of the five opinions expressing the varying views of the Justices, it was assumed that the requirement of cause conferred a substantive property right. The differences expressed were disagreements about the amount of protection required by the Fifth Amendment. Viewing *Arnett* from the perspective of my suggested four-step analysis, the property interest arose because the federal statute was the functional equivalent of an express contract of employment which was clear and unequivocal in its terms.

CJSPR cannot be so considered by Mr. Hamm. Rules 25 and 26 must be read in the context of all of the other rules, including Rule 46 prohibiting any review of a discharge. Read in a light most favorable to the plaintiff, there are so many ambiguities and inconsistencies contained in these rules that it is impossible to characterize them as an expression of a mutual agreement. Upon the record before me, I find that the plaintiff had no recognizable interest in his employment.

2. Is the enforcement of the claimed contractual or other property interest contrary to the expressed public policy of that state?

Even if the language of personnel Rules 25 and 26 could be read to create a contractual right to continued employment, the plaintiff here still could not prevail because the recognition of such a contract would violate the expressed public policy of the State of Colorado.

Application of the proposed analysis to *Bishop v. Wood, supra*, provides a good illustration of this point. There, the fact that the Marion ordinance conditioned petitioner's dismissal on cause could be regarded as having created for him a recognizable property interest based on implied contract. [Step 1]. But by the district court's reading of *Still v. Lance*, 279 N.C. 254, 182 S.E.2d 403 (1971), the Supreme Court of North Carolina had expressly negated the existence of such an interest in public employment absent *explicit* statutory or contractual guarantees. Thus, the expressed public policy of the state had extinguished, as unenforceable, that which otherwise might have constituted a validly claimed protectable property interest. [Step 2].[4]

As previously noted, the Colorado Constitution gives absolute authority over the judicial department to the Supreme Court of Colorado, with administrative control vested in the chief justice. Rule 46 of CJSPR, adopted by the Supreme Court, is unequivocal in excluding chief probation officers from any right of review of the termination of their employment. While the Colorado General Assembly has suggested that the court adopt personnel rules which compare to those applicable to the employees covered by the merit system in the Constitution, the Colorado Supreme Court has quite clearly excluded specific types of judicial employees from any protection against arbitrary action by the appointing authority.

It must be recognized that, in Colorado, all of the justices and judges of the judicial department are accountable to the people. They can be removed from office by the Colorado Supreme Court after investigation by a commission on judicial qualifications, pursuant to Article VI, Section 23 of the Colorado Constitution, and they are dependent upon an affirmative vote of the elector-

4. Utilization of this two-step approach has the advantage of overcoming the seeming inconsistency between *Bishop* and its immediate predecessor, *Arnett v. Kennedy*, supra. In *Arnett*, six Justices were of the view that an employee necessarily had a property interest if his discharge was conditioned on cause. [See, footnote 8, *Bishop v. Wood*, supra.] By breaking down the analysis into two discrete steps, *Arnett* and *Bishop* can be reconciled to mean that a cause requirement may be sufficient to create a protectable property interest, if, and only if, such a grant is not contrary to the expressed public policy of the state.

ate for serving succeeding terms of office under Section 25 of Article VI.

Those who serve the judges and justices in the exercise of their sensitive duties, which certainly include chief probation officers, are made wholly accountable to those who are, in turn, responsible to the public for the performance of their courts. Thus, there is a direct comparability between this position of chief probation officer and that of the regent in *Mitchell v. King, supra.*

3. Is the recognized enforceable property interest worthy of the protection of procedural due process under the Fourteenth Amendment?

■ Following the suggested four-step analysis, if it were to be assumed that the plaintiff did have a recognizable property interest which would not be contrary to express public policy, would that interest require the protection of procedural due process under the Fourteenth Amendment? In my view it would not. Again, the nature of the position does not present a need for protecting freedom of action by the employee. Indeed, assistance to the judges in the exercise of their sentencing power is a function which requires subordination of the individual's views and efforts to the authority of the decision-maker. Under any balancing of interests approach, the weight of the public interest in performance is much heavier than the individual's claim to the benefits of employment. Accordingly, the Fourteenth Amendment affords no protection to this plaintiff in this case, other than the ordinary protections that would be afforded in a court of law on a breach of contract suit.

4. How much protection is required?

■ Finally, assuming that some process were due to him, how much protection must be given? The Plaintiff here asks that this court order a review board hearing for him in the same manner as that which is provided for permanent employees of the judicial department who are not excluded from review by Rule 46. That would be more than the United States Constitution would require. Again, the amount of protection to be given must be determined by a balancing of the public and private interests and, again, the public interest predominates. In my view, the minimum opportunity to learn of the reasons for the action and a chance to address the decision-maker, as was held to constitute adequate protection in *Goss v. Lopez, supra,* is all that would be required here. That was done by Chief Judge Scott. While it could be contended that his approach to the plaintiff was authoritarian, his action did meet the kind of minimal standards which the Supreme Court has, at times, recognized as due process. I reach that conclusion with considerable personal regret, because I am reluctant to follow the view that the sturdy shield protecting the individual against government action, which was formerly recognized to require an opportunity for the clash of adversary interests at trial, has been so abraded as to permit the courts to characterize this type of hearing as due process of law.

■ The plaintiff here also claimed an infringement of a liberty interest. That claim was essentially withdrawn at the preliminary injunction hearing. It is also clear that the plaintiff has no evidence that there was any stigmatic effect upon him or his reputation resulting from the discharge. Accordingly, there is no support for a claim of infringement of a protected liberty interest.

Upon the foregoing findings of fact and conclusions of law, it is

ORDERED that the plaintiff's complaint and this civil action are dismissed.